STEPHEN R. HARRIS, ESQ.
**Nevada Bar No. 001463**
CHRIS D. NICHOLS, ESQ.
**Nevada Bar No. 003123**
BELDING, HARRIS & PETRONI, LTD.
417 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 786-7600
Facsimile: (775) 786-7764

Attorneys for Debtor

ELECTRONICALLY FILED BY
BELDING, HARRIS & PETRONI, LTD.

ON _____ 2/4/10

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \*

IN RE:

FIRSTGOLD CORP.
a Delaware corporation,

Debtor.

_____/

Case No. 10-50215
(Chapter 11)

**MOTION FOR INTERIM AND
FINAL ORDER AUTHORIZING
DEBTOR TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING UNDER
11 U.S.C. § 364(b) AND F.R.B.P
4001(c)**

Hrg. DATE:
Hrg. TIME:
Est Time:    10 minutes
Set By:       Judge Zive – OST

FIRSTGOLD CORP., a Delaware corporation, Debtor and Debtor-In-Possession in the above captioned Chapter 11 case ("Debtor"), hereby moves the Court for an entry of an order authorizing the Debtor to obtain post-petition financing pursuant to 11 U.S.C. §364(b) and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

This Motion is supported by the entire record before the Court, and by the following memorandum of points and authorities.

**Jurisdiction and Venue**

1. The Debtor FIRSTGOLD CORP., a Delaware corporation, filed a voluntary petition for

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

1

relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1330 (the "Bankruptcy Code"), on January 27, 2010.

2. This Court has jurisdiction over this Chapter 11 proceeding under 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

3. The Debtor is in the business of gold mining and maintains an office in Lovelock, Pershing County, Nevada. Accordingly, venue of the Debtor's Chapter 11 proceeding is proper in this District under 28 U.S.C. §§ 1408 and 1409. The Debtor currently owes approximately $15,357,568.00 to Platinum Long Term Growth, LLC; $3,837,592.00 to Lakewood Group, LLC; $317,139.00 to Pershing County Industrial Park, LLC, and $168,982 to GE Capital (collectively "Secured creditors"). Additionally, Debtor owed approximately $759,770.06 to priority unsecured creditors and $6,892,963.12 to general unsecured creditors as of the Petition Date. The Debtor had approximately 1,094 shareholders of record as of the Petition Date.

4. The statutory predicates for the relief requested in this Motion are Bankruptcy Code §364(b) the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules.

**Relief Requested**

5. By this Motion, the Debtor seeks authorization under section 364(b) of the Bankruptcy Code, to:

a.     Obtain unsecured post-petition financing of $350,000.00 in the form of Loan Agreements, Promissory Notes and Secured Exchangeable Promissory Notes (collectively "Gold Notes"), by and between FIRSTGOLD CORP., as Borrower, and various undetermined lenders, as the DIP Lenders (the "DIP Facility");

b.     Grant the DIP Lenders priority in payment, pursuant to section 364(b) of the Bankruptcy Code with respect to such obligations equal to any and all administrative expenses as specified in Sections 502(b) and 507(b) of the Bankruptcy Code, to the extent

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

-2-

permitted by law;

    c.    Grant the DIP Lenders, in order to secure Debtor's obligations under the DIP Facility, the following:

        (a)    Administrative claim status in this Chapter 11 case with respect to payment of the principal and 12% per annum interest due on each Gold Note; and

        (b)    Schedule, pursuant to Bankruptcy Rule 4001, a final hearing on this Motion (the "final DIP Hearing") and establish notice procedures with respect to the Final DIP Hearing, for this Court to consider entry of a final order authorizing the DIP Facility (the "Final DIP Order").

### Basis for Relief

6. Debtor has determined that the DIP Facility is necessary for its immediate cash needs to continue to operate its business and for a successful reorganization. To ensure the uninterrupted business operations of the Debtor, Debtor has concluded that obtaining a firm commitment for post-petition financing at the outset of this case is necessary and in the best interest of the Debtor.

### Summary of the Terms of the DIP Facility

7. The terms and conditions of the proposed DIP Facility are set forth in detail in the form attached hereto and incorporated herewith as **Exhibit "A"**. The following is a summary of the most significant terms and conditions of the proposed DIP Facility. This summary of the DIP Facility is qualified in its entirety by reference to the Gold Note. If any conflict exists between this summary and the Gold Note, then the terms and provisions of Gold Note control:

        (a)    *Borrower*. FIRSTGOLD CORP., a Delaware corporation ("Borrower").

        (b)    *Commitments*. The DIP Facility provides for the extension of credit in a maximum post-petition amount of $350,000, by issuance of Gold Notes in the form attached hereto as **Exhibit "A"**. Although the Gold Notes indicate

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

3

that the total proceeds to be raised are $500,000, Debtor raised $150,000 in cash pre-petition under the Gold Notes, and requests authorization at this time to borrow an additional sum not to exceed $350,000 post-petition. Furthermore, even though the notes are styled as Secured Exchangeable Promissory Notes they are not secured by any collateral and are in actuality unsecured notes. Due to the immediate cash needs of the Debtor, the Debtor has already obtained an additional $100,000 advance under the Gold Notes post-petition on February 4, 2010.

(c)     *Closing Date*.  The DIP Facility shall close following execution of the Gold Notes and satisfying the terms thereof, subject only to the Bankruptcy Court having entered the DIP Order.

(d)     *Term*.  Borrowing shall be repaid in full, as follows: Principal and accrued interest of 12% per annum on each Gold Note shall be paid as an administrative unsecured claim, with a maturity date of 12 months from issuance.  The remaining repayment terms consisting of certain gold rights issued to DIP Lenders and Debtor's right to call the Gold Notes and gold rights therein by paying 4.33 times the original promissory note amount shall only be exercised after all administrative, secured, priority and unsecured creditors are paid in full.

(e)     *Use of Proceeds*.  The DIP Facility will be available to finance the Debtor's ongoing business operations, pursuant to the Cash Requirements Budget attached hereto and incorporated herewith as **Exhibit "B"**.

(f)     *Priority and Collateral*.  To secure the Debtor's obligations under the DIP Facility, all obligations of the Debtor to the DIP Lenders shall be entitled to

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

administrative expense claim status equal to all other administrative claims pursuant to Section 364(b) of the Bankruptcy Code in this Chapter 11 Case.

(g)  *Advances.* Debtor has previously received advances from various lenders, of $150,000.00 pre-petition pursuant to the Gold Notes, which advances shall reduce the additional funds borrowed by the Debtor post-petition to $350,000.00 and which advances shall be otherwise modified to be subject to the applicable Bankruptcy Court orders.

(h)  *Interest Rate.* The Gold Notes shall bear interest at the rate of 12% per annum, in addition to certain gold rights.

(i)  *Events of Default.* The Gold Notes do not contain any specific events of default.

(j)  *Conditions to Funding of Any Disbursements.* There are no conditions to funding any disbursements, and the proceeds from the Gold Notes shall be used by the Debtor at its discretion to pay for its operating expenses as set forth in the proposed cash budget attached hereto as **Exhibit "B".**

(k)  *Interim Approval of DIP Facility.* The Debtor seeks approval of the DIP Facility on an interim basis if necessary (the "Interim DIP Approval") pending entry of the Final DIP Order by the Court. The Debtor will serve notice of this Motion to all known creditors and its 100 largest shareholders.

### Negotiations of the DIP Facility

8.  The Debtor negotiated the terms of the DIP Facility in good faith and at arms' length. In fact, before agreeing to enter into the DIP Facility, the Debtor explored other options with third party sources for debtor-in-possession financing, all of which either refused to propose a debtor-

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

5

in-possession loan to the Debtor or proposed terms substantially less favorable than the proposed DIP Facility.  The Debtor determined that issuance of the Gold Notes, under the circumstances, are the most favorable in light of the Debtor's immediate working capital needs.  Accordingly, the Debtor, in its sound business judgment, ultimately made the decision to issue the Gold Notes to interested lenders for post-petition financing.  *See, e.g., Bray v. Shenandoah Federal Savings and Loan Ass'n, (In re Snowshoe Co.)*, 789 F2d 1085, 1088 (4th Cir. 1986) (that trustee contacted other financial institutions in the immediate geographic areas and was unsuccessful satisfied the requirements of Section 364 of the Bankruptcy Code); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (unsuccessful attempts to secure financing from other sources justified senior priority loan under Section 364); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (that the debtors had contacted four lenders satisfied the requirement of Section 364 that the debtors were unable to obtain comparable financing on an unsecured basis).

9.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *In re Snowshoe Co.*, 789 F.2d at 1088.  Where there are few lenders likely to be able or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Savings Bank FSB v. Sky Valley , Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

### Applicable Authority

10.  This Court may authorize the Debtor to enter into the DIP Facility pursuant to Section 105(a) of the Bankruptcy Code, which grants broad authority to a court to enforce the provision of the Bankruptcy Code under equitable common law doctrines.  Furthermore, Section 364(b)

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

-6-

specifically allows the Debtor, after notice and hearing, to obtain unsecured credit or to incur unsecured debt as an administrative expense.

11.  Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

The foregoing provisions of Sections 105 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c) authorize the Court to grant the relief requested herein.

## Approval of the DIP Facility Is Necessary for the

## Debtor's Reorganization

12.  As described above, it is essential to the success of the Debtor's Chapter 11 case that it obtain access to sufficient post-petition financing, without which the Debtor will be unable to ensure uninterrupted business operations, and therefore, continue to operate or generate income. Absent access to the working capital financing that will be available to the Debtor under the DIP Facility, the Debtor may be unable to meet its ordinary course operating expenses and thus will be unable to preserve the Debtor's value as a going concern.  The Debtor's continuing viability and its ability to reorganize successfully depend heavily on the Court's approval of the DIP Facility.

## The Debtor Adequately Explored

## Alternatives to the DIP Facility

13.  A post-petition financing facility of the type needed in this case could not have been obtained on better terms than those the Debtor has accepted.  The Debtor will show that potential sources of a similar credit facility for the Debtor, obtainable quickly and on reasonable terms, are limited.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

7

lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d at 1088. Where there are few lenders likely to be able or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct and exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

14. In the weeks leading up to the filing of this Chapter 11 case, the Debtor approached several parties to obtain post-petition financing. Because of the complexity and uniqueness of the Debtor's operations and collateral base, the Debtor directed its inquiries to a limited number of parties most likely to provide adequate post-petition financing. Following negotiations with these potential lenders, the Debtor has concluded in its best judgment that it could not have obtained a post-petition credit facility to meet its working capital needs on terms more favorable than those contained in the DIP Facility.

15. After appropriate investigation and analysis, the Debtor's management reasonably concluded that the Gold Notes were the best alternative available to it. Consequently, the Debtor's efforts in this regard satisfy the statutory requirement of Section 364(b) of the Bankruptcy Code.

### The Terms of the DIP Facility are Fair, Reasonable, and Appropriate

16. The proposed terms of the DIP Facility are fair, reasonable and adequate. The purpose of the DIP Facility is to enable the Debtor to maintain the value of its estate while formulating a confirmable plan of reorganization. *See In re First South Savv. Ass'n*, 820 F.2d 700, 710-15 (5th Cir. 1987); *In re Tenney Village Co.*, 104 B.R. 562, 568069 (Bankr. D.N.H. 1989).

17. The various terms set forth in the Gold Notes are reasonable and appropriate under the circumstances. The interest rate charged is 12% per annum, and there are no origination fees or

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

-8-

loan closing fees. Courts routinely authorize similar lender terms and incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

18. With access to the DIP Facility, the Debtor is confident that it can achieve a strong financial performance. The Debtor's ability to achieve a successful reorganization depends on unimpeded operations and continued generation of targeted levels of cash flow until such time as it can obtain more permanent Debtor-in-Possession financing.

## Application of the Business Judgment Standard

19. As described above, after appropriate investigation and analysis, the Debtor's management has concluded that the DIP Facility is the best alternative available under the circumstances. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and no to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,*, 762 F.2d 1303, 1311 (5th Cir. 1985).

20. In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 507, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

9

made in good faith, upon a reasonable basis, and within the scope of his authority under the

Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

21.  The Debtor has exercised sound business judgment in determining that a post petition

credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP

Facility.  The terms of the DIP Facility are fair and reasonable and are in the best interests of the

Debtor's estate.  Accordingly, under Section 364(b) of the Bankruptcy Code, the Debtor should be

granted authority to enter into the DIP Facility and to borrow funds from various lenders in the

form of Gold Notes as more fully set forth above.

### Approval and Minimum Cash Requirements

### for Continued Business Operations

22.  Bankruptcy Rule 4001(b) and(c) provide that a final hearing on a motion to obtain

credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 15

days after the service of such motion.  Upon request, however, the Court is authorized to conduct

a preliminary expedited hearing on the motion and authorize the use of cash collateral and the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's

estate.  On an interim basis, the Debtor requests authorization to borrow the sum of $350,000 in

the form of Gold Notes.  The hearing on this Motion is scheduled to provide less than 15 days

notice to creditors and parties in interest; thus the Debtor requests an interim Order approving the

DIP Facility, and further requests that the Court schedule a subsequent hearing to consider final

approval of the DIP Facility.

### Notice with Respect to Final DIP Order

23.  Because the Debtor will seek interim relief under this Motion, the Debtor respectfully

requests that it be authorized to serve copies of this Motion by first class mail, email or facsimile

upon: (a) counsel to any official committee of unsecured creditors appointed in this case; (b) the

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

-10-

Office of the United States Trustee; (c) all parties who have filed requests for Notice pursuant to Bankruptcy Rule 2002; (d) the proposed lenders; (e) the one hundred largest shareholder of the Debtor and (f) all of the unsecured creditors of the Debtor; and (g) the secured creditors of the Debtor. The Debtor further request that the Court consider such notice of the interim DIP hearing to be sufficient notice under Bankruptcy Rule 4001.

## Secured Creditors and Collateral Positions

24. The Debtor currently owes approximately $15,357,568.00 to Platinum Long Term Growth, LLC; $3,837,592.00 to Lakewood Group, LLC; $317,139.00 to Pershing County Industrial Park LLC, and $168,982 to GE Capital (collectively "Secured creditors"). The Debtor is not requesting any type of secured lien for the DIP Facility, and the Gold Notes shall be paid as allowed administrative expenses equal in priority to other administrative claims.

## Granting Adequate Protection, and Alternative Relief

## If Adequate Protection Is Deemed Inadequate

25. The Debtor is requesting interim approval by the Court, by giving the proposed DIP Lenders unsecured administrative claim status equal to that of all other allowed administrative claims. The reason for the hearing that seeks to have loan approval on an interim basis in the amount of $350,000.00, is to approve the advances the Debtor will need to continue forward in business for the next 3 months. Without these monies, the Debtor will be forced to cease operations, which cessation of business operations not only negatively impacts the existing employees, but the value of the Debtor's estate and its creditors. It is in all of the parties best interests, including the Debtor, its secured creditors, priority unsecured creditors and its unsecured creditors, to ensure that the Debtor's business operations continue operating and generating revenue.

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

11

## Conclusion

**WHEREFORE**, the Debtor respectfully requests that the Court approve the interim DIP Facility, authorizing the Debtor to obtain credit and incur indebtedness pursuant to the DIP Facility, and enter into and perform according to the terms of the Gold Notes, substantially in the form attached hereto as **Exhibit "A"**; and to schedule a hearing to consider final approval of the DIP Facility; and grant such additional and further relief as is just and proper.

Respectfully submitted this 4th day of February, 2010.

STEPHEN R. HARRIS, ESQ.
BELDING, HARRIS & PETR0NI, LTD.
417 West Plumb Lane
Reno, NV 89509


  /s/ Stephen R. Harris
Attorney for Debtor

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

-12-

## V E R I F I C A T I O N

I, TERRY LYNCH, President of FIRSTGOLD CORP., Debtor named in the foregoing

**MOTION FOR INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN DEBTOR-IN-**

**POSSESSION FINANCING UNDER 11 U.S.C. § 364(b) AND F.R.B.P. 4001(c)** declare under

penalty of perjury that the foregoing is true and correct.

Dated this 4 day of February, 2010.


_____
TERRY LYNCH, President
FIRSTGOLD CORP.,
a Delaware corporation

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

13

# EXHIBIT "A"

**January 2010**

**Term Sheet - Firstgold Corp.**

**ALL AMOUNTS IN U.S. CURRENCY**

| | |
|---|---|
| Issuer: | Firstgold Corp. |
| Securities: | Secured  exchangeable promissory notes (each, a "Note") shall be issued by Firstgold Corp. ("FGD") on or about January 19th, 2010  for an amount of up to $500,000 in the aggregate, pursuant to the terms of a loan agreement, providing, *inter alia,* for a term of one year payable on demand, interest on the principal amount at the rate of 12% per annum,  payable in arrears at maturity.  Subject to regulatory approval, the promissory note shall be exchangeable at the option of the holder into either (i) common shares of Firstgold Corp. at a price of $0.036 cents per share or such other lower price if Firstgold should accept or issue equity at anytime before December 31 2012 at a price lower than $0.036 per share. |
| | In addition, FGD shall grant to the purchaser of a Note, the right to purchase from FGD's available gold production one troy ounce of gold from FGD at a price of $500 per ounce for every $150 principal amount of Note purchased. |
| Right to Call: | FGD has the right to call the promissory note and the gold rights. By paying 4.33 times the original promissory note amount in FGD shares at $0.036 per share with a maximum profit of $500 per ounce. |
| Total Proceeds: | $500,000 |
| Use of Proceeds: | The net proceeds shall be used to enable FGD to pay for operational costs and to fund a potential Chapter 11 Bankruptcy process. |
| Maturity Date: | December 31, 2010 |
| Closing Date: | On or before January 19, 2010. |
| Registration: | The Private Placement of Notes is to accredited investors, does not contemplate Registration Rights and will be subject to applicable statutory hold periods. |
| Expiration of Terms: | The terms and conditions offered herein will expire on January 19th, 2010. |

Agreed to and accepted this _____ day of _____ 2010 on behalf

of_____ by:

_____
Signature

_____
Please print Name & Title

## PROMISSORY NOTE

**February 2, 2010**                                                      US$50,000

**FOR VALUE RECEIVED** the undersigned promises to pay to or to the order of Salina Lee, with an address of Lee Siu Fun,ROOM 02, 9/F.,33 ARGYLE STREET, KOWLOON, HONG KONG, the principal amount of US$50,000 together with interest in accordance with the provisions of the loan agreement entered into between the undersigned, as borrower, and the Lender, made as of the date hereof (the "**Loan Agreement**").

Payments received shall be applied firstly in payment of unpaid accrued interest and the balance, if any, in reduction of principal.

Subject to the provisions of the Loan Agreement, the undersigned shall be entitled to prepay any amount in respect of principal at any time or times during the term of the loan without notice, bonus or penalty.

The undersigned acknowledges that this Promissory Note has been issued by the undersigned for business purposes within the meaning of the *Limitations Act, 2002* (Ontario), and the undersigned agrees that any limitation period applicable to this Promissory Note (other than the ultimate limitation period provided for in Section 15 of the said Act) is suspended and shall not apply to this Promissory Note or the obligations of the undersigned hereunder.

Upon the occurrence of an Event of Default as defined in the Loan Agreement, the entire unpaid balance of the principal amount, accrued interest and all other indebtedness owing pursuant to the Loan Agreement shall, at the option of the Lender, become immediately due and payable without notice or demand and the undersigned covenants to pay interest thereon and on subsequent overdue interest at the rates set out in the Loan Agreement, both before and after judgment, until payment in full.

The covenant to pay interest hereunder shall not merge on the taking of a judgment or judgments with respect to any of the obligations herein stipulated for.

**PRESENTMENT FOR PAYMENT AND PROTEST WAIVED.**

**DATED** as of the 2nd day of February, 2010.

FIRSTGOLD CORP.

Per:

_____

Terry Lynch  Director

I have authority to bind the Corporation

**LOAN AGREEMENT**

Made as of February 2, 2010

Between

**FIRSTGOLD CORP.**
as Borrower

and

**Lee Siu Fun**
as Lender

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** made as of the 2nd day of February, 2010,

**B E T W E E N:**

> **FIRSTGOLD CORP.**, a corporation incorporated pursuant to the laws of the State of Delaware,
>
> (hereinafter referred to as the "**Borrower**"),
>
> - and -
>
> , Lee Siu Fun
>
> (hereinafter referred to as the "**Lender**"),

**WHEREAS** the Lender has agreed to loan to the Borrower the sum of $50,000 USD, subject to the provisions of this Agreement;

**NOW THEREFORE THIS AGREEMENT WITNESSETH** that, in consideration of the covenants and agreements contained herein and for other good and valuable consideration (the receipt and adequacy whereof are hereby acknowledged), the parties hereto agree as follows:

1.  **INTERPRETATION**

1.1  In this Agreement:

    (a)    "**Affiliate**" has the meaning ascribed thereto in the *Business Corporations Act* (Ontario);

    (b)    "**Agreement**", "**hereto**", "**hereof**", "**hereby**", "**hereunder**" and similar expressions refer to this loan agreement and not to any particular section or other portion hereof, and include any and every instrument supplemental or ancillary hereto or in the implementation hereof;

    (c)    "**Arm's Length**" has the meaning ascribed to it under the *Income Tax Act* (Canada);

    (d)    "**Corporate Distribution**" means the amount of:

        (i)    any dividend or other distribution based on the issued and outstanding shares in the capital of the Borrower;

        (ii)    the purchase, redemption or retirement price of any issued and outstanding shares in the capital of the Borrower redeemed, purchased or otherwise retired by the Borrower;

        (iii)    any management or consulting fee or bonus to any of the shareholders of the Borrower or any person related to any such shareholders, except normal remuneration payable to employees of the Borrower; or

(iv)     any payment on account of any principal or interest on any loans or advances owing at any time by the Borrower to any of its Affiliates or to its shareholders;

(e)     "**Date of Advance**" means the date on which the Advance is made under Section 2.1 hereof;

(f)     "**Event of Default**" means any of the events specified in Section 8.1 hereof;

(g)     "**generally accepted accounting principles**" or "**GAAP**" means the accounting principles recommended by the Canadian Institute of Chartered Accountants as provided in the "CICA Handbook", as the same may be amended, replaced or restated from time to time;

(h)     "**Indebtedness**" includes all principal, interest and interest on overdue interest owing pursuant to the provisions of this Agreement;

(i)     "**Loan**" means the total principal amount advanced and outstanding at any time hereunder, together with accrued and unpaid interest thereon, if any;

(j)     "**Promissory Note**" means the promissory note issued by the Borrower in favour of the Lender pursuant to Section 2.5 hereof;

(k)     "**Subsidiary**" has the meaning ascribed thereto in the *Business Corporations Act* (Ontario); and

(l)     "**Third Party**" means a third party dealing at Arm's Length with the Borrower and the Covenantor.

## 2.     PRINCIPAL AMOUNT, REPAYMENT AND INTEREST

All amounts expressed herein are in U.S. currency unless otherwise specified.  The Lender hereby agrees to lend to the Borrower, upon the terms hereinafter set forth and subject to compliance by the Borrower with the terms and conditions hereof, an amount of  $50,000 (the "**Advance**"), such Advance to occur simultaneously with the execution of this Agreement by all parties.

### 2.1     Principal and Interest

Interest shall be payable, at a rate per annum which is equal to twelve percent (12%) (the "**Interest Rate**"), calculated annually, not in advance, from the Date of Advance, on the principal amount and on overdue interest, if any, from time to time remaining unpaid, payable as set out on the payment dates in Section 2.4 hereof.

### 2.2     Interest

Interest as aforesaid shall be paid on the principal amount advanced, both before and after maturity, both before and after the occurrence of an Event of Default and after judgement computed from the Date of Advance.

### 2.3     Principal and Interest Payment

Subject to Section 2.6, the principal and interest payments in respect of the Advance shall be payable upon the earlier of (i) written demand made upon the Borrower by the Lender, or (ii) the

one (1) year anniversary of the Date of Advance, and otherwise in accordance with the terms contained herein as well as the terms contained in the Promissory Note.  It is expressly acknowledged that subject to regulatory approval, the Lender shall have the right, at its option, to convert the whole or any part of the Advance and accrued interest into either common shares of the Corporation at a price of $0.036 per common share. Nonwithstanding this right it is also agreed between the parties that the borrower may at any time call the promissory note and the gold rights by paying four and one third times the original promissory note amount in Firstgold Corp shares at $0.036 per share.

**Promissory Note**

The Advance shall be evidenced by a promissory note in favour of the Lender on the terms set out in Sections 2.2 and 2.3 hereof and be subject to Section 2.4 hereof (the **"Promissory Note"**).

2.4    **Prepayment**

The Borrower, upon ten (10) day's written notice to the Lender, may prepay any amount in respect of the principal amount of the Loan at any time or times during the term of this Loan without notice, bonus or penalty, and, in the event of such prepayment, the principal and interest payment schedule set out in Section 2.4 shall be adjusted accordingly.

## 3.    ADVANCES

3.1    The Lender shall be under no obligation to make the Advance until the Borrower shall have provided the Lender with:

(a)    a duly executed copy of this Agreement;

(b)    a duly executed Promissory Note for the Advance;

(c)    any additional documents which the Lender may reasonably require.

3.2    The obligation of the Lender to make the Loan is further subject to and conditional upon the following conditions being satisfied:

(a)    the Lender shall have received satisfactory reports on the financial position of the Borrower as it may specify time to time, but in any event no more than quarterly; and

(b)    the representations and warranties of the Borrower set out herein shall be true and correct.

3.3    The terms and conditions set forth herein are inserted for the sole benefit of the Lender and may be waived prior to advancing without prejudicing any further rights of the Lender to assert such terms and conditions upon the occurrence of an Event of Default.

## 4.    REPRESENTATIONS AND WARRANTIES

4.1    The Borrower represents and warrants to the Lender, and acknowledges that the Lender is relying on such representations and warranties in entering into this Agreement and in making the advance hereunder, as follows:

- 4 -

(a)     <u>Status</u>

The Borrower has been duly incorporated or amalgamated and organized and is a valid and subsisting corporation in good standing under the laws of its jurisdiction of incorporation and has full capacity and power to carry on its business as the same is presently carried out and to own and lease its property.

(b)     <u>Power, Authority</u>

The Borrower has the necessary power and authority to borrow the monies hereunder and has the necessary power and authority to enter into, execute, deliver and perform this Agreement.

(c)     <u>Necessary Action</u>

All necessary steps and proceedings have been taken to authorize the entering into, delivery and performance of the Agreement.

(d)     <u>Violation of Other Instruments and Authorization</u>

The entering into of this Agreement and any other agreement additional or collateral hereto does not conflict and will not conflict with, and does not result, and will not result, in a breach or violation of, or constitute a default under, its Articles of Incorporation or Amalgamation, constating documents or the by-laws or any other covenants contained in any agreement to which it is a party or by which it is bound or to which it is subject and do not require the consent or approval of any person save as provided to the Lender.

(e)     <u>Valid Obligations</u>

This Agreement constitutes valid and enforceable obligations of the Borrower enforceable in accordance with their terms.

(f)     <u>Location, Ownership and Description of Assets</u>

    (i)     All of the assets of the Borrower are situate in the State of Nevada and State of California; and

    (ii)     The Borrower has good title to all its property and assets subject to existing encumbrances.

(g)     <u>Insolvency Proceedings</u>

The Borrower has not made any assignment for the benefit of creditors nor has any receiving orders been made against it or a proposal filed by it under applicable bankruptcy or creditor relief legislation. However the Borrower is contemplating a Chapter 11 filing and has reviewed this possibility with the Lender.

- 5 -

(h)    Compliance with Laws

To the best of its knowledge, the Borrower is not in breach of any by-laws, laws, statutes, regulations, rules or orders, municipal or otherwise, relating in any way to the operations of its business.

4.2    **Survival of Representations Warranties and Covenants**

The covenants, agreements, representations and warranties set forth in this Agreement and in any certificate or other document delivered hereunder shall, notwithstanding any investigation made by the Lender or its counsel or any other representative of the Lender or the making of any advance hereunder, shall continue in full force and effect until repayment in full of all of the Indebtedness.

5.    **COVENANTS**

5.1    **Positive Covenants**

The Borrower hereby covenants and agrees with the Lender as follows so long as any of the Indebtedness remains unpaid:

(a)    To Repay Indebtedness

The Borrower shall well, duly and punctually pay or cause to be paid to the Lender the Indebtedness at the dates, times and places and in the manner mentioned herein.

(b)    Notice of Material Change

The Lender shall be given prompt written notice of any material change in the business or condition of the Borrower, financial or otherwise, or of any material loss, destruction of or damage to the property and assets of the Borrower.

(c)    Financial Statements

The Borrower shall furnish to the Lender within forty-five (45) days after the end of each fiscal quarter of the Borrower financial statements as follows:

(i)    consolidated balance sheet, prepared in accordance with generally accepted accounting principles applied on a consistent basis; and

(ii)    consolidated statements of profit and loss, surplus and source and use of funds, prepared in accordance with generally accepted accounting principles applied on a consistent basis for such quarter.

(d)    Other Information

The Lender shall be promptly furnished with such other information respecting the Borrower as the Lender may from time to time reasonably request including information with respect to the status of all licenses.

(e)   <u>To Maintain Existence</u>

The Borrower shall at all times ensure that it maintain its legal existence.

(f)   <u>Books of Account</u>

The Borrower shall carry on its business in a proper and efficient manner and shall keep or cause to be kept proper books of account and make or cause to be made therein true and faithful entries of all material dealings in relation to its business.

(g)   <u>To Pay Taxes</u>

The Borrower shall pay or cause to be paid all taxes, rates, government fees and dues levied, assessed or imposed upon it and upon its properties or any part thereof.

(h)   <u>The Lender Entitled to Perform Covenants</u>

If the Borrower shall fail to perform any covenant on its part herein contained, the Lender may in its discretion perform any of the said covenants capable of being performed by it and, if any such covenant requires the payment or expenditure of money, the Lender may make payments or expenditures with its own funds, or with money borrowed by or advanced to it for such purpose, but shall be under no obligation to do so; and all sums so expended or advanced shall be at once payable by the Borrower on demand and shall bear interest at a rate equal to the Interest Rate, and shall be payable out of any funds coming into the possession of the Lender in priority to the Indebtedness but no such performance or payment shall be deemed to relieve the Borrower from any Event of Default hereunder.

(i)   <u>Payment of Costs and Expenses</u>

The Borrower shall pay or reimburse the Lender and its agent for all reasonable costs, charges and expenses (including legal fees and disbursements on a solicitor and his own client basis) of or incurred by the Lender in connection with the recovery or enforcement of repayment of the Indebtedness or any part thereof, and any amount not so paid shall bear interest at a rate equal to the Interest Rate, and shall be payable out of any funds coming into the possession of the Lender in priority to the Indebtedness.

(j)   <u>Term Sheet For Restructuring</u>

The Borrower shall use its commercially reasonable best efforts to execute upon the Term Sheet providing for the restructuring of the Borrower's indebtedness substantially in the form attached hereto as Schedule A.

(k)   <u>Grant to Lender of Right To Purchase Gold</u>

The Borrower shall no later than two years from the date hereof but as soon as Borrower is permitted to do so under applicable law, sell to the Lender at the Lender's sole option physical gold at a price of $500 per ounce for every $150 advanced by Lender to Borrower under the terms of this Agreement. In the alternative, at the Lender's option, Borrower shall remit to the Lender by bank draft or bank wire any positive difference

between the opening US NYMEX spot gold price on the date following the request and $500.

(l)  Regulatory Approval for Conversion Rights

The Borrower shall use its commercially reasonable best efforts to obtain regulatory approval to permit the conversion rights contemplated in subparagraph 2.3 hereof.

5.2  **Negative Covenants**

The Borrower hereby covenants and agrees with the Lender as follows so long as the Indebtedness remains unpaid:

(a)  Restriction on Corporate Distribution

The Borrower shall not become liable in respect of or pay any Corporate Distribution at any time when the Borrower shall be in default hereunder or where the payment of the Corporate Distribution would render the Borrower in default, without the prior written consent of the Lender.

(b)  Restrictions

The Borrower shall not, without the prior written consent of the Lender:

(i)  purchase or redeem any of its issued and outstanding shares; and

(ii)  repay any outstanding shareholder loans.

(c)  Not to change Fiscal Year

The Borrower shall not change its fiscal year without the prior consent of the Lender which consent shall not be unreasonably withheld.

(d)  Loans and Guarantees

The Borrower shall not indirectly or directly make loans or advances or give security or guarantee or otherwise become liable for the debts of any persons save those given to or in relation to the Lender.

6.  **DEFAULT AND ENFORCEMENT**

6.1  **Events of Default**

Each and every one of the following shall be an event of default (an "**Event of Default**") under this Agreement:

(a)  if the Borrower makes default in payment of the Loan (or any portion thereof), interest or costs associated with the Loan as and when the same becomes due under any provision hereof, provided that the Borrower shall have a one-time opportunity to remedy any such payment default by making such payment within five (5) days following its due date;

(b)     if the Borrower shall neglect to carry out, observe or comply with any covenant or condition hereunder, other than covenants to pay indebtedness, in any material respect which materiality may be determined by the Lender in its absolute discretion (acting reasonably and in good faith), provided that the Borrower shall have five (5) days following the date on which such covenant or condition was to be performed, satisfied or fulfilled to make good such default before the Borrower shall be in default hereunder;

(c)     if the Borrower ceases or threaten to cease carrying on its business or if a petition shall be filed or an order shall be made or effective resolution be passed for the winding-up or liquidation of the Borrower;

(d)     if any of the representations and warranties contained herein shall prove to have been false or misleading in a material respect at any time during the term hereof in any material respect which materiality may be determined by the Lender in its absolute discretion (acting reasonably and in good faith); and

(e)     if the Borrower shall be in default under any written agreement entered into in favour of the Lender at any time and such default is not cured within any time period allowed within such agreement to cure defaults.

6.2     **Acceleration on Default**

Upon the occurrence of an Event of Default, the Lender may in addition to any other rights and remedies provided for herein or a law or in equity, declare the whole of the Indebtedness to become immediately due and payable and the same shall forthwith become immediately due and payable and the Borrower shall forthwith pay to the Lender the Indebtedness together with subsequent interest thereon at the rate provided for herein from the date of such declaration until payment is received by the Lender.

6.3     **Indemnification**

In addition to any other agreement or obligation hereunder, the Borrower agrees to indemnify and save harmless the Lender, and each of its officers, directors, employees and agents, from and against all indebtedness, liabilities, obligations, losses, damages, actions, suits, proceedings, judgments, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed upon, incurred or suffered by the Lender relating in any way to the Loan, including, without limitation, any breach of any representation or warranty or any non performance or non fulfilment of any covenant or agreement made or given by the Borrower hereunder.

6.4     **Waiver of Default**

The Lender may at any time waive in writing any Event of Default which may have occurred provided that no such waiver shall extend to or be taken in any manner whatsoever to effect any subsequent Event of Default or the rights and remedies resulting there from.

6.5     **Remedies Cumulative**

Each of the remedies available to the Lender hereunder is entitled to be a separate remedy and in no way is a limitation on any one or more of the other remedies otherwise available to the Lender and the rights and remedies herein expressly specified are cumulative and not exclusive.  The Lender may in its sole discretion exercise any and all of the rights of powers, remedies and

recourses available under this Agreement or any other remedy available to it, and such rights, powers and remedies and recourses may be exercised concurrently or individually to the necessity of any election.

**6.6    Remedies Not Prejudiced by Delay**

No delay or omission of the Lender to exercise any remedy shall impair any such remedy or shall be construed as a waiver of any default hereunder or acquiescence therein.

**7.    MISCELLANEOUS**

**7.1    Notices**

Notice hereunder shall be deemed to have effectively been given five (5) days after mailing when sent by registered mail or the day following delivery if sent by personal delivery to the following address or such other address as shall be notified in writing from time to time by the parties herein:

To the Borrower at:

> 1055 Cornell Ave., P.O. Box 6,
> Lovelock, NV
> T2P 2V6
>
> Attention:    Jim Kluber

To the Lender at:
Lee Siu Fun
ROOM 02, 9/F.,
33 ARGYLE STREET, KOWLOON, HONG KONG

> Attention:    Lee Siu Fun

**7.2    Enurement and Assignment**

The Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective permitted heirs, administrators, successors and assigns including any successors by way of amalgamation.  This Agreement may be assigned by the Lender, in which event the Borrower shall attorn in all respects to such assignment and the assignee thereof.  This Agreement may not be assigned by the Borrower.

**7.3    Jurisdiction**

This Agreement and all certificates and other documents delivered to the Lender shall be construed and interpreted in accordance with the laws of the Province of Ontario.

- 10 -

7.4   **Counterparts**

This Agreement may be signed in counterparts and each counterpart shall constitute an original document and the counterparts, taken together, shall constitute one and the same instrument.

7.5   **Facsimile**

Execution and delivery of a facsimile transmission of this Agreement shall constitute, for purposes of this Agreement, delivery of an executed original and shall be binding upon the party whose signature appears on the transmitted copy.  Any party so executing this Agreement hereby undertakes to originally execute and deliver to the other party hereto a copy of this Agreement as soon as possible after execution by facsimile.

*[Signature page follows]*

**IN WITNESS WHEREOF** the parties have hereunto affixed their corporate seal under the hands of their proper signing officers duly authorized in that behalf on the date first written above.

**FIRSTGOLD CORP.**

Per: _____

Terry Lynch CEO
I have the authority to bind the Borrower

Per: _____

Lee Siu Fun

I have the authority to bind the Lender

**January 2010**

**Term Sheet - Firstgold Corp.**

**ALL AMOUNTS IN U.S. CURRENCY**

Issuer:                    Firstgold Corp.

Securities:        Secured  exchangeable promissory notes (each, a "Note") shall be issued by Firstgold
                   Corp. ("FGD") on or about January 19th, 2010  for an amount of up to $500,000 in the
                   aggregate, pursuant to the terms of a loan agreement, providing, *inter alia,* for a term of
                   one year payable on demand, interest on the principal amount at the rate of 12%  per
                   annum,  payable in arrears at maturity.  Subject to regulatory approval, the promissory
                   note shall be exchangeable at the option of the holder into either (i) common shares of
                   Firstgold Corp. at a price of $0.036 cents per share or such other lower price if Firstgold
                   should accept or issue equity at any time before December 31 2012 at a price lower than
                   $0.036 per share.

                   In addition, FGD shall grant to the purchaser of a Note, the right to purchase from FGD's
                   available gold production one troy ounce of gold from FGD at a price of $500 per ounce
                   for every $150 principal amount of Note purchased.

Right to Call:     FGD has the right to call the promissory note and the gold rights. By paying 4.33 time
                   the original promissory note amount in FGD shares at $0.036 per share with a maximum
                   profit of $500 per ounce.

Total Proceeds:        $500,000

Use of Proceeds:       The net proceeds shall be used to enable FGD to pay for operational costs and
                       to fund a potential Chapter 11 Bankruptcy process.

Maturity Date:         December 31, 2010

Closing Date:          On or before January 19, 2010.

Registration:          The Private Placement of Notes is to accredited investors, does not contemplate
                       Registration Rights and will be subject to applicable statutory hold periods.

Expiration of Terms    The terms and conditions offered herein will expire on January 19th, 2010.

Agreed to and accepted this _____ day of _____ 2010 on behalf

of_____ by:

_____

Signature


_____

Please print Name & Title

**PROMISSORY NOTE**

**February 02, 2010**                                                                          **US$50,000**

**FOR VALUE RECEIVED** the undersigned promises to pay to or to the order of IORDAN TARACHMANOV, with an address of 6, Hristo Maximov Str. 1111 Sofia Bulgaria, the principal amount of US$100,000 together with interest in accordance with the provisions of the loan agreement entered into between the undersigned, as borrower, and the Lender, made as of the date hereof (the "**Loan Agreement**").

Payments received shall be applied firstly in payment of unpaid accrued interest and the balance, if any, in reduction of principal.

Subject to the provisions of the Loan Agreement, the undersigned shall be entitled to prepay any amount in respect of principal at any time or times during the term of the loan without notice, bonus or penalty.

The undersigned acknowledges that this Promissory Note has been issued by the undersigned for business purposes within the meaning of the *Limitations Act, 2002* (Ontario), and the undersigned agrees that any limitation period applicable to this Promissory Note (other than the ultimate limitation period provided for in Section 15 of the said Act) is suspended and shall not apply to this Promissory Note or the obligations of the undersigned hereunder.

Upon the occurrence of an Event of Default as defined in the Loan Agreement, the entire unpaid balance of the principal amount, accrued interest and all other indebtedness owing pursuant to the Loan Agreement shall, at the option of the Lender, become immediately due and payable without notice or demand and the undersigned covenants to pay interest thereon and on subsequent overdue interest at the rates set out in the Loan Agreement, both before and after judgment, until payment in full.

The covenant to pay interest hereunder shall not merge on the taking of a judgment or judgments with respect to any of the obligations herein stipulated for.

**PRESENTMENT FOR PAYMENT AND PROTEST WAIVED.**

**DATED** as of the 2nd day of February, 2010.

**FIRSTGOLD CORP.**

Per:

_____
Terry Lynch  Director

I have authority to bind the Corporation

**LOAN AGREEMENT**

Made as of February 2, 2010

Between

**FIRSTGOLD CORP.**
as Borrower

and

**IORDAN TARACHMANOV**
as Lender

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** made as of the 2nd day of January, 2010,

**B E T W E E N:**

> **FIRSTGOLD CORP.**, a corporation incorporated pursuant to the laws of the State of Delaware,
>
> (hereinafter referred to as the "**Borrower**"),
>
> - and -
>
> , IORDAN TARACHMANOV
> (hereinafter referred to as the "**Lender**"),

**WHEREAS** the Lender has agreed to loan to the Borrower the sum of $50,000 USD, subject to the provisions of this Agreement;

**NOW THEREFORE THIS AGREEMENT WITNESSETH** that, in consideration of the covenants and agreements contained herein and for other good and valuable consideration (the receipt and adequacy whereof are hereby acknowledged), the parties hereto agree as follows:

## 1. INTERPRETATION

1.1    In this Agreement:

(a)    "**Affiliate**" has the meaning ascribed thereto in the *Business Corporations Act* (Ontario);

(b)    "**Agreement**", "**hereto**", "**hereof**", "**hereby**", "**hereunder**" and similar expressions refer to this loan agreement and not to any particular section or other portion hereof, and include any and every instrument supplemental or ancillary hereto or in the implementation hereof;

(c)    "**Arm's Length**" has the meaning ascribed to it under the *Income Tax Act* (Canada);

(d)    "**Corporate Distribution**" means the amount of:

(i)    any dividend or other distribution based on the issued and outstanding shares in the capital of the Borrower;

(ii)    the purchase, redemption or retirement price of any issued and outstanding shares in the capital of the Borrower redeemed, purchased or otherwise retired by the Borrower;

(iii)    any management or consulting fee or bonus to any of the shareholders of the Borrower or any person related to any such shareholders, except normal remuneration payable to employees of the Borrower; or

(iv)    any payment on account of any principal or interest on any loans or advances owing at any time by the Borrower to any of its Affiliates or to its shareholders;

(e)    "**Date of Advance**" means the date on which the Advance is made under Section 2.1 hereof;

(f)    "**Event of Default**" means any of the events specified in Section 8.1 hereof;

(g)    "**generally accepted accounting principles**" or "**GAAP**" means the accounting principles recommended by the Canadian Institute of Chartered Accountants as provided in the "CICA Handbook", as the same may be amended, replaced or restated from time to time;

(h)    "**Indebtedness**" includes all principal, interest and interest on overdue interest owing pursuant to the provisions of this Agreement;

(i)    "**Loan**" means the total principal amount advanced and outstanding at any time hereunder, together with accrued and unpaid interest thereon, if any;

(j)    "**Promissory Note**" means the promissory note issued by the Borrower in favour of the Lender pursuant to Section 2.5 hereof;

(k)    "**Subsidiary**" has the meaning ascribed thereto in the *Business Corporations Act* (Ontario); and

(l)    "**Third Party**" means a third party dealing at Arm's Length with the Borrower and the Covenantor.

## 2.    PRINCIPAL AMOUNT, REPAYMENT AND INTEREST

All amounts expressed herein are in U.S. currency unless otherwise specified. The Lender hereby agrees to lend to the Borrower, upon the terms hereinafter set forth and subject to compliance by the Borrower with the terms and conditions hereof, an amount of $50,000 (the "**Advance**"), such Advance to occur simultaneously with the execution of this Agreement by all parties.

### 2.1    Principal and Interest

Interest shall be payable, at a rate per annum which is equal to twelve percent (12%) (the "**Interest Rate**"), calculated annually, not in advance, from the Date of Advance, on the principal amount and on overdue interest, if any, from time to time remaining unpaid, payable as set out on the payment dates in Section 2.4 hereof.

### 2.2    Interest

Interest as aforesaid shall be paid on the principal amount advanced, both before and after maturity, both before and after the occurrence of an Event of Default and after judgement computed from the Date of Advance.

### 2.3    Principal and Interest Payment

Subject to Section 2.6, the principal and interest payments in respect of the Advance shall be payable upon the earlier of (i) written demand made upon the Borrower by the Lender, or (ii) the

one (1) year anniversary of the Date of Advance, and otherwise in accordance with the terms contained herein as well as the terms contained in the Promissory Note.  It is expressly acknowledged that subject to regulatory approval, the Lender shall have the right, at its option, to convert the whole or any part of the Advance and accrued interest into either common shares of the Corporation at a price of $0.036 per common share or such lower price if Firstgold issues Shares at a lower price at any time up until December 31 2012.

**Promissory Note**

The Advance shall be evidenced by a promissory note in favour of the Lender on the terms set out in Sections 2.2 and 2.3 hereof and be subject to Section 2.4 hereof (the **"Promissory Note"**).

2.4    **Prepayment**

The Borrower, upon ten (10) day's written notice to the Lender, may prepay any amount in respect of the principal amount of the Loan at any time or times during the term of this Loan without notice, bonus or penalty, and, in the event of such prepayment, the principal and interest payment schedule set out in Section 2.4 shall be adjusted accordingly.

**3.    ADVANCES**

3.1    The Lender shall be under no obligation to make the Advance until the Borrower shall have provided the Lender with:

(a)    a duly executed copy of this Agreement;

(b)    a duly executed Promissory Note for the Advance;

(c)    any additional documents which the Lender may reasonably require.

3.2    The obligation of the Lender to make the Loan is further subject to and conditional upon the following conditions being satisfied:

(a)    the Lender shall have received satisfactory reports on the financial position of the Borrower as it may specify time to time, but in any event no more than quarterly; and

(b)    the representations and warranties of the Borrower set out herein shall be true and correct.

3.3    The terms and conditions set forth herein are inserted for the sole benefit of the Lender and may be waived prior to advancing without prejudicing any further rights of the Lender to assert such terms and conditions upon the occurrence of an Event of Default.

**4.    REPRESENTATIONS AND WARRANTIES**

4.1    The Borrower represents and warrants to the Lender, and acknowledges that the Lender is relying on such representations and warranties in entering into this Agreement and in making the advance hereunder, as follows:

(a)    <u>Status</u>

The Borrower has been duly incorporated or amalgamated and organized and is a valid and subsisting corporation in good standing under the laws of its jurisdiction of incorporation and has full capacity and power to carry on its business as the same is presently carried out and to own and lease its property.

(b)    <u>Power, Authority</u>

The Borrower has the necessary power and authority to borrow the monies hereunder and has the necessary power and authority to enter into, execute, deliver and perform this Agreement.

(c)    <u>Necessary Action</u>

All necessary steps and proceedings have been taken to authorize the entering into, delivery and performance of the Agreement.

(d)    <u>Violation of Other Instruments and Authorization</u>

The entering into of this Agreement and any other agreement additional or collateral hereto does not conflict and will not conflict with, and does not result, and will not result, in a breach or violation of, or constitute a default under, its Articles of Incorporation or Amalgamation, constating documents or the by-laws or any other covenants contained in any agreement to which it is a party or by which it is bound or to which it is subject and do not require the consent or approval of any person save as provided to the Lender.

(e)    <u>Valid Obligations</u>

This Agreement constitutes valid and enforceable obligations of the Borrower enforceable in accordance with their terms.

(f)    <u>Location, Ownership and Description of Assets</u>

    (i)    All of the assets of the Borrower are situate in the State of Nevada and State of California; and

    (ii)    The Borrower has good title to all its property and assets subject to existing encumbrances.

(g)    <u>Insolvency Proceedings</u>

The Borrower has not made any assignment for the benefit of creditors nor has any receiving orders been made against it or a proposal filed by it under applicable bankruptcy or creditor relief legislation. However the Borrower is contemplating a Chapter 11 filing and has reviewed this possibility with the Lender.

(h)     Compliance with Laws

> To the best of its knowledge, the Borrower is not in breach of any by-laws, laws, statutes, regulations, rules or orders, municipal or otherwise, relating in any way to the operations of its business.

4.2     **Survival of Representations Warranties and Covenants**

The covenants, agreements, representations and warranties set forth in this Agreement and in any certificate or other document delivered hereunder shall, notwithstanding any investigation made by the Lender or its counsel or any other representative of the Lender or the making of any advance hereunder, shall continue in full force and effect until repayment in full of all of the Indebtedness.

5.     **COVENANTS**

5.1     **Positive Covenants**

The Borrower hereby covenants and agrees with the Lender as follows so long as any of the Indebtedness remains unpaid:

(a)     To Repay Indebtedness

> The Borrower shall well, duly and punctually pay or cause to be paid to the Lender the Indebtedness at the dates, times and places and in the manner mentioned herein.

(b)     Notice of Material Change

> The Lender shall be given prompt written notice of any material change in the business or condition of the Borrower, financial or otherwise, or of any material loss, destruction of or damage to the property and assets of the Borrower.

(c)     Financial Statements

> The Borrower shall furnish to the Lender within forty-five (45) days after the end of each fiscal quarter of the Borrower financial statements as follows:

> (i)     consolidated balance sheet, prepared in accordance with generally accepted accounting principles applied on a consistent basis; and

> (ii)    consolidated statements of profit and loss, surplus and source and use of funds, prepared in accordance with generally accepted accounting principles applied on a consistent basis for such quarter.

(d)     Other Information

> The Lender shall be promptly furnished with such other information respecting the Borrower as the Lender may from time to time reasonably request including information with respect to the status of all licenses.

(e)    <u>To Maintain Existence</u>

The Borrower shall at all times ensure that it maintain its legal existence.

(f)    <u>Books of Account</u>

The Borrower shall carry on its business in a proper and efficient manner and shall keep or cause to be kept proper books of account and make or cause to be made therein true and faithful entries of all material dealings in relation to its business.

(g)    <u>To Pay Taxes</u>

The Borrower shall pay or cause to be paid all taxes, rates, government fees and dues levied, assessed or imposed upon it and upon its properties or any part thereof.

(h)    <u>The Lender Entitled to Perform Covenants</u>

If the Borrower shall fail to perform any covenant on its part herein contained, the Lender may in its discretion perform any of the said covenants capable of being performed by it and, if any such covenant requires the payment or expenditure of money, the Lender may make payments or expenditures with its own funds, or with money borrowed by or advanced to it for such purpose, but shall be under no obligation to do so; and all sums so expended or advanced shall be at once payable by the Borrower on demand and shall bear interest at a rate equal to the Interest Rate, and shall be payable out of any funds coming into the possession of the Lender in priority to the Indebtedness but no such performance or payment shall be deemed to relieve the Borrower from any Event of Default hereunder.

(i)    <u>Payment of Costs and Expenses</u>

The Borrower shall pay or reimburse the Lender and its agent for all reasonable costs, charges and expenses (including legal fees and disbursements on a solicitor and his own client basis) of or incurred by the Lender in connection with the recovery or enforcement of repayment of the Indebtedness or any part thereof, and any amount not so paid shall bear interest at a rate equal to the Interest Rate, and shall be payable out of any funds coming into the possession of the Lender in priority to the Indebtedness.

(j)    <u>Term Sheet For Restructuring</u>

The Borrower shall use its commercially reasonable best efforts to execute upon the Term Sheet providing for the restructuring of the Borrower's indebtedness substantially in the form attached hereto as Schedule A.

(k)    <u>Grant to Lender of Right To Purchase Gold</u>

The Borrower shall no later than two years from the date hereof but as soon as Borrower is permitted to do so under applicable law, sell to the Lender at the Lender's sole option physical gold at a price of $500 per ounce for every $150 advanced by Lender to Borrower under the terms of this Agreement. In the alternative, at the Lender's option, Borrower shall remit to the Lender by bank draft or bank wire any positive difference

- 7 -

between the opening US NYMEX spot gold price on the date following the request and $500.

(l)   <u>Regulatory Approval for Conversion Rights</u>

The Borrower shall use its commercially reasonable best efforts to obtain regulatory approval to permit the conversion rights contemplated in subparagraph 2.3 hereof.

5.2   **Negative Covenants**

The Borrower hereby covenants and agrees with the Lender as follows so long as the Indebtedness remains unpaid:

(a)   Restriction on Corporate Distribution

The Borrower shall not become liable in respect of or pay any Corporate Distribution at any time when the Borrower shall be in default hereunder or where the payment of the Corporate Distribution would render the Borrower in default, without the prior written consent of the Lender.

(b)   <u>Restrictions</u>

The Borrower shall not, without the prior written consent of the Lender:

(i)   purchase or redeem any of its issued and outstanding shares; and

(ii)   repay any outstanding shareholder loans.

(c)   <u>Not to change Fiscal Year</u>

The Borrower shall not change its fiscal year without the prior consent of the Lender which consent shall not be unreasonably withheld.

(d)   <u>Loans and Guarantees</u>

The Borrower shall not indirectly or directly make loans or advances or give security or guarantee or otherwise become liable for the debts of any persons save those given to or in relation to the Lender.

**6.**   **DEFAULT AND ENFORCEMENT**

6.1   **Events of Default**

Each and every one of the following shall be an event of default (an "**Event of Default**") under this Agreement:

(a)   if the Borrower makes default in payment of the Loan (or any portion thereof), interest or costs associated with the Loan as and when the same becomes due under any provision hereof, provided that the Borrower shall have a one-time opportunity to remedy any such payment default by making such payment within five (5) days following its due date;

- 8 -

(b)　　if the Borrower shall neglect to carry out, observe or comply with any covenant or condition hereunder, other than covenants to pay indebtedness, in any material respect which materiality may be determined by the Lender in its absolute discretion (acting reasonably and in good faith), provided that the Borrower shall have five (5) days following the date on which such covenant or condition was to be performed, satisfied or fulfilled to make good such default before the Borrower shall be in default hereunder;

(c)　　if the Borrower ceases or threaten to cease carrying on its business or if a petition shall be filed or an order shall be made or effective resolution be passed for the winding-up or liquidation of the Borrower;

(d)　　if any of the representations and warranties contained herein shall prove to have been false or misleading in a material respect at any time during the term hereof in any material respect which materiality may be determined by the Lender in its absolute discretion (acting reasonably and in good faith); and

(e)　　if the Borrower shall be in default under any written agreement entered into in favour of the Lender at any time and such default is not cured within any time period allowed within such agreement to cure defaults.

6.2　**Acceleration on Default**

Upon the occurrence of an Event of Default, the Lender may in addition to any other rights and remedies provided for herein or a law or in equity, declare the whole of the Indebtedness to become immediately due and payable and the same shall forthwith become immediately due and payable and the Borrower shall forthwith pay to the Lender the Indebtedness together with subsequent interest thereon at the rate provided for herein from the date of such declaration until payment is received by the Lender.

6.3　**Indemnification**

In addition to any other agreement or obligation hereunder, the Borrower agrees to indemnify and save harmless the Lender, and each of its officers, directors, employees and agents, from and against all indebtedness, liabilities, obligations, losses, damages, actions, suits, proceedings, judgments, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed upon, incurred or suffered by the Lender relating in any way to the Loan, including, without limitation, any breach of any representation or warranty or any non performance or non fulfilment of any covenant or agreement made or given by the Borrower hereunder.

6.4　**Waiver of Default**

The Lender may at any time waive in writing any Event of Default which may have occurred provided that no such waiver shall extend to or be taken in any manner whatsoever to effect any subsequent Event of Default or the rights and remedies resulting therefrom.

6.5　**Remedies Cumulative**

Each of the remedies available to the Lender hereunder is entitled to be a separate remedy and in no way is a limitation on any one or more of the other remedies otherwise available to the Lender and the rights and remedies herein expressly specified are cumulative and not exclusive.  The Lender may in its sole discretion exercise any and all of the rights of powers, remedies and

recourses available under this Agreement or any other remedy available to it, and such rights, powers and remedies and recourses may be exercised concurrently or individually to the necessity of any election.

**6.6    Remedies Not Prejudiced by Delay**

No delay or omission of the Lender to exercise any remedy shall impair any such remedy or shall be construed as a waiver of any default hereunder or acquiescence therein.

**7.    MISCELLANEOUS**

**7.1    Notices**

Notice hereunder shall be deemed to have effectively been given five (5) days after mailing when sent by registered mail or the day following delivery if sent by personal delivery to the following address or such other address as shall be notified in writing from time to time by the parties herein:

To the Borrower at:

> 1055 Cornell Ave., P.O. Box 6,
> Lovelock, NV
> T2P 2V6
>
> Attention:      Jim Kluber

To the Lender at: 6, Hristo Maximov Str. 1111 Sofia Bulgaria Suite 900 123 Front Street Toronto, Ontario,

> Attention:      IORDAN TARACHMANOV

**7.2    Enurement and Assignment**

The Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective permitted heirs, administrators, successors and assigns including any successors by way of amalgamation.  This Agreement may be assigned by the Lender, in which event the Borrower shall attorn in all respects to such assignment and the assignee thereof.  This Agreement may not be assigned by the Borrower.

**7.3    Jurisdiction**

This Agreement and all certificates and other documents delivered to the Lender shall be construed and interpreted in accordance with the laws of the Province of Ontario.

**7.4    Counterparts**

This Agreement may be signed in counterparts and each counterpart shall constitute an original document and the counterparts, taken together, shall constitute one and the same instrument.

- 10 -

7.5     **Facsimile**

Execution and delivery of a facsimile transmission of this Agreement shall constitute, for purposes of this Agreement, delivery of an executed original and shall be binding upon the party whose signature appears on the transmitted copy.  Any party so executing this Agreement hereby undertakes to originally execute and deliver to the other party hereto a copy of this Agreement as soon as possible after execution by facsimile.

*[Signature page follows]*

**IN WITNESS WHEREOF** the parties have hereunto affixed their corporate seal under the hands of their proper signing officers duly authorized in that behalf on the date first written above.

**FIRSTGOLD CORP.**

Per: _____
Terry Lynch CEO
I have the authority to bind the Borrower

Per: _____
IORDAN TARACHMANOV

I have the authority to bind the Lender

# EXHIBIT "B"

Firstgold Corp
January 21, 2010
Cash Requirements
Consolidated

| Description | week of 1/18 | week of 1/25 | week of 2/1 | week of 2/8 | week of 2/15 | week of 2/22 | week of 3/1 | week of 3/8 | week of 3/15 | week of 3/22 | week of 3/29 | Total Uses from 01/04 Through 4/2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operations total | $0 | $0 | $29,987 | $19,613 | $59,289 | $36,264 | $8,252 | $19,613 | $27,289 | $17,975 | $22,289 | $240,570 |
| Corporate total | $0 | $0 | $50,768 | $1,500 | $6,000 | $14,000 | $40,768 | $0 | $6,000 | $21,000 | $6,000 | $146,036 |
| Total Uses | $0 | $0 | $80,755 | $21,113 | $65,289 | $50,264 | $49,020 | $19,613 | $33,289 | $38,975 | $28,289 | $386,606 |
| Accumulated Uses | $0 | $0 | $80,755 | $101,868 | $167,157 | $217,420 | $266,440 | $286,053 | $319,342 | $358,317 | $386,606 | $386,606 |

Firstgold Corp
January 21, 2010
Cash Requirements
Operations

| Description | week of 1/18 | week of 1/25 | week of 2/1 | week of 2/8 | week of 2/15 | week of 2/22 | week of 3/1 | week of 3/8 | week of 3/15 | week of 3/22 | week of 3/29 | Total Uses from 01/18 Through 4/2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lab Building Mortgage | | | | $1,613 | | | | $1,613 | | | | $3,226 |
| NDEP Projects @ Relief Canyon | | | $2,000 | $2,000 | $2,000 | | $2,000 | $2,000 | | | | $10,000 |
| Metallurgical testing of heaps | | | | | | | | | | | | $0 |
| Payroll-hourly | | | $11,075 | | $11,075 | $11,075 | | | $11,075 | | $11,075 | $55,375 |
| Payroll-salary | | | $7,214 | | $7,214 | $7,214 | | | $7,214 | | $7,214 | $36,069 |
| Payroll-lab | | | | | | | | | | | | $0 |
| Workers Comp insurance | | | $3,446 | | | $3,446 | | | | $3,446 | | $10,338 |
| GL, Property & Auto insurance | | | $4,252 | | | $6,029 | $4,252 | | | $6,029 | | $20,562 |
| Enviroscientists | | | | | $20,000 | | | | | | | $20,000 |
| St of Nevada taxes | | | | | $12,000 | | | | | | | $12,000 |
| Equipment repairs/ Crusher | | | | | | | | | | | | $0 |
| GE Capital | | | | $11,000 | | | | $11,000 | | | | $22,000 |
| Caterpillar Finance | | | | | $5,000 | $4,000 | | | $5,000 | $4,000 | | $18,000 |
| Utilities | | | | $5,000 | | $2,500 | | $5,000 | | $2,500 | | $15,000 |
| Fuel, operating supplies, etc | | | | | $2,000 | $2,000 | $2,000 | | $2,000 | | $2,000 | $10,000 |
| Cushion | | | $2,000 | | | | | | $2,000 | $2,000 | $2,000 | $8,000 |
| Total Uses | $0 | $0 | $29,987 | $19,613 | $59,289 | $36,264 | $8,252 | $19,613 | $27,289 | $17,975 | $22,289 | $240,570 |

Firstgold Corp.
January 21, 2010
Cash Requirements
Corporate

| Description | week of 1/18 | week of 1/25 | week of 2/1 | week of 2/8 | week of 2/15 | week of 2/22 | week of 3/1 | week of 3/8 | week of 3/15 | week of 3/22 | week of 3/29 | Total Uses from 01/04 Through 4/2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Audit | | | | | | | | | | | | $0 |
| Legal | | | $10,000 | | | $10,000 | | | | $20,000 | | $40,000 |
| Payroll | | | $37,768 | | $3,000 | $3,000 | $37,768 | | $3,000 | | $3,000 | $87,536 |
| Office lease | | | | | | | | | | | | $0 |
| Consulting fees | | | | | | | | | | | | $0 |
| Tax payments | | | | $1,500 | | | | | | | | $1,500 |
| Platinum | | | | | | | | | | | | $0 |
| Annual Meeting | | | | | | | | | | | | $0 |
| Transfer Agent | | | | | | $1,000 | | | | $1,000 | | $2,000 |
| Press releases, newsletter | | | $1,000 | | $1,000 | | $1,000 | | $1,000 | | $1,000 | $5,000 |
| Cushion | | | $2,000 | | $2,000 | | $2,000 | | $2,000 | | $2,000 | $10,000 |
| Total Uses | $0 | $0 | $50,768 | $1,500 | $6,000 | $14,000 | $40,768 | $0 | $6,000 | $21,000 | $6,000 | $146,036 |