1  Rew R. Goodenow (SBN 3722)                          Efiled March 25, 2010
   **PARSONS BEHLE & LATIMER**
2  50 West Liberty Street
   Suite 750
3  Reno, NV 89501
   Tel: 775-323-1601
4  Fax: 775-348-7250
   RGoodenow@parsonsbehle.com
5
   Daniel H. Reiss (Admitted *Pro Hac Vice*)
6  **LEVENE, NEALE, BENDER, RANKIN & BRILL, LLP**
   10250 Constellation Blvd, Suite 1700
7  Los Angeles, CA 90067
   Tel:    310-229-1234
8  Fax:    310-229-1244
   dhr@lnbrb.com
9
   Attorneys for Secured Creditors Platinum Long Term Growth LLC and Lakewood Group, LLC
10

11                      UNITED STATES BANKRUPTCY COURT

12                            DISTRICT OF NEVADA

13

14
   In re                                  Case No.  BK-N-10-50215- GWZ
15
   FIRSTGOLD CORP.,                        Chapter 11
16
                        Debtor.            **MOTION BY PLATINUM LONG TERM
17                                          GROWTH LLC AND THE LAKEWOOD
                                            GROUP, LLC TO CONVERT CASE TO
18                                          CHAPTER 7, OR ALTERNATIVELY,
                                            FOR RELIEF FROM THE AUTOMATIC
19                                          STAY**

20                                         Hearing
                                           Date:  April 22, 2010
21                                         Time:  2:00 p.m.
                                           Place: Ctrm. 1
22

23

24        TO  THE  HONORABLE  GREGG  ZIVE,  UNITED  STATES  BANKRUPTCY

25  JUDGE;  THE  DEBTOR  AND  DEBTOR  IN  POSSESSION;  THE  OFFICE  OF  THE

26  UNITED STATES TRUSTEE; AND ALL OTHER PARTIES IN INTEREST:

27

28

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 2

II.   ARGUMENT ...................................................................................... 6

    A.    Brief Background ...................................................................... 6

        1.    Amount owed to Secured Creditors .............................. 6

        2.    Secured Creditors are under secured .............................. 6

        3.    Misrepresentations to the Secured Creditors – pre petition ............ 6

        4.    Post-Petition misrepresentations to this Court and creditors .......... 7

    B.    Cause Exists to Convert This Chapter 11 Case to Chapter 7 ...................... 8

        1.    This bankruptcy estate is sustaining continuing losses and diminution ...................................................................... 8

        2.    The Debtor has not demonstrated a reasonable likelihood of rehabilitation in this case nor is it able to formulate or perform under a feasible business plan ............................................................ 9

            a.    The Debtor is not maintaining and improving "land status". 9

            b.    The Debtor has not established any proven mineral resources ............................................................... 9

            c.    There have been no appropriate metallurgical studies ......... 10

            d.    The Debtor has not, and currently cannot, formulate the appropriate mine business plan .............................................. 12

            e.    The Debtor cannot demonstrate that it will obtain necessary environmental permitting within a reasonable time period in this case .............................................................. 12

            f.    The Debtor has failed to show any progress with respect to developing Relief Canyon into an operating mine within any reasonable timeframe and within the necessary environmental compliance guidelines ................................... 14

e.   The Debtor's past economic performance demonstrates that management cannot successfully reorganize the Debtor's operations in this chapter 11 case ...................................................... 15

C.   Cause Exists To Lift the Automatic Stay ....................................................... 16

1.   The interests of the Secured Creditors are not adequately protected ........................................................................................... 17

2.   The Debtor does not have equity in the Secured Creditors' collateral and there is no reorganization in prospect ......................... 17

III.   CONCLUSION ..................................................................................................... 18

ii

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.
   484 U.S. 363, 108 S.Ct. 626, L.Ed. 2d 740 (1988)---------------------------------------------------- 17

5

6

STATUTES

7

11 U.S.C. § 1112(a)----------------------------------------------------------------------------------------2

8

11 U.S.C. § 1112(a)(4)(A) -----------------------------------------------------------------------------------8

9

11 U.S.C. § 362(d) ------------------------------------------------------------------------------------- 2, 16

10

11 U.S.C. § 362(d)(1) and (2) --------------------------------------------------------------------------- 16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1         Secured creditors Platinum Long Term Growth LLC and Lakewood Group LLC (together,

2    the "Secured Creditors") hereby move this Court for an order converting this case from chapter

3    11 to chapter 7 of the Bankruptcy Code under 11 U.S.C. § 1112(a), or alternatively, for relief

4    from the automatic stay under 11 U.S.C. § 362(d) as follows:

**I.**

**INTRODUCTION.**

7         This case has now been pending for nearly sixty days.[1]  Firstgold Corp., the debtor in

8    possession herein, (the "Debtor") has not provided this Court with one shred of evidence that

9    demonstrates that the Debtor is capable of exiting from this case by way of a confirmable chapter

10   11 plan.  On the other hand, the Secured Creditors have previously filed substantial evidence with

11   this Court (which evidence is again submitted herewith) that shows that the Debtor's current

12   management is not capable of moving this case forward toward a confirmable chapter 11 plan.

13        The Secured Creditors establish, by and through the detailed declaration of its mining

14   consultant Mr. Eric Klepfer (the "Klepfer Declaration"), that the Relief Canyon mine has been

15   mismanaged for several years.  The Debtor has faltered at every fundamental step relating to gold

16   and silver production at the mine over a period of several years and after $75 million of capital

17   infused by the Debtor's investors and creditors.  Importantly, despite the opportunity to do so at

18   recent hearings, the Debtor has not refuted the Secured Creditors' evidence of the unmitigated

19   failure of this Debtor to develop Relief Canyon into a viable operation.  The Debtor does not

20   provide evidence of any present or future ability (1) to move forward to establish the existence of

21   mineral reserves at Relief Canyon (none have been proven), (2) to conduct the necessary

22   geological and metallurgical testing to move toward a mining program, (3) to formulate a feasible

23   business plan to attract investors, (4) to secure financing to ensure that the Debtor's assets –

24   including valuable mining claims, permits, property and equipment – will not be irreparably

25   harmed, (5) or to propose a chapter 11 plan of reorganization that meets the requirements of the

26   Bankruptcy Code.  Due to these undisputed factors, the Court has admonished the Debtor that it

27

28   [1] This case was filed on January 27, 2010.

2

1    needs to file a "significant, viable and verifiable" chapter 11 plan of reorganization by the end of

2    March to avoid conversion or dismissal of this case.[2]

3         The Debtor's only response to the Secured Creditor's evidence and arguments has been

4    unsupported speculations by its CEO, Terry Lynch, about future money from foreign investors or

5    an elusive and very expensive venture or transaction involving the claims on neighboring

6    property that are purportedly held by Newmont Mining Corporation ("Newmont") and Victoria

7    Gold Corp. ("Victoria").[3]  These unsubstantiated "visions of what could be" do not alter the

8    conclusion that the Debtor does not have a coherent business plan to emerge from this chapter 11

9    case.

10        It has also been established that the Relief Canyon mine is currently in a "care and

11   maintenance" program and is currently in a government-approved state of temporary closure.

12   There are no mining operations. Nonetheless, the Court has authorized the Debtor to borrow up

13   to $350,000 through the date of the hearing on this Motion. The Court has generously authorized

14   the Debtor to pay officers' salaries and incur other expenses beyond that which is necessary for

15   the care and maintenance of the Relief Canyon mine on the oral representations of the Debtor that

16   these expenses were necessary for the Debtor to reach a deal with one or more third parties that

17   would purportedly result in a chapter 11 plan.[4]

18        To date, these expenditures beyond the care and maintenance of the mine have not

19   resulted in any demonstrable benefit to any party except the Debtor's management. Instead, the

20   net assets of this estate have been diminished to the potentially irreparable harm of all creditors

21   and stakeholders. Remarkably, the Debtor's monthly operating report for the month of February

---

[2]  "And it is relatively obvious to me that in the absence of having a substantial verifiable viable plan, whether it's new money, a purchase by the end of this month, that I will hold the debtor to what I was told and I will look at either converting or dismissing in early April."

See excerpts from the transcript from the hearing March 10, 2010 relating to the Debtor's motion for approval of post-petition financing, pg. 16. lns. 6 – 11, Ex. "A" hereto, of which the court is requested to take judicial notice.

[3]  It is important to note that the discussions with Newmont or Victoria have not included new capital from these companies; rather, the discussions have been with respect to rights to be acquired by the Debtor in exchange for *10,000 ounces of gold* from the Debtor's future production – which is obviously highly contingent and speculative. See Lynch testimony, March 10, 2010 Transcript, pg. 60, ln. 8 through pg. 61, ln. 6, Ex. "A" hereto.

[4]  March 10, 2010 Transcript, pgs. 69 – 72, Ex. "A" hereto.

3

1   shows a net *loss* of over $473,000.[5]  In addition, substantial expenses will begin to accrue that, if

2   not paid, will cause further irreparable harm to the Debtor's assets and the collateral of the

3   Secured Creditors.  For example, in September 2010, the Debtor's mining leases issued by the

4   United States Bureau of Land Management must be paid for at an estimated cost of over

5   $100,000.  Consequently, the ultimate disposition of this bankruptcy case and the Relief Canyon

6   mine cannot be unnecessarily delayed by continued attempts by the Debtor to "limp along" while

7   ever greater administrative expenses accumulate with no ability ever to pay them.

8          The Secured Creditors and all stakeholders are at risk of being irreparably harmed due to

9   the Debtor's lack of competent management.  These stakeholders should not continue to bear the

10   potentially irreparable risk of further mismanagement of the assets which are their sole source of

11   recovery.  As discussed previously, the Debtor's management has no experience with respect to

12   developing a mine – *with no proven resources* - into a profitable mining operation.

13   Management's self-serving pipedream must be put to an end to minimize the harm to the estate

14   and its creditors.

15          Further, the Debtor has made a number of representations in this case that smack of bad

16   faith and deception.  In the Debtor most recent public SEC filings, the October 31, 2009, the

17   Debtor represents that its total assets are $17,957,805.[6]   However, the Debtor's bankruptcy

18   schedules state that the Debtor's total assets are $100,834,811.29[7] – **a discrepancy of over \$83**

19   **million**. The only explanation appears to be that the Debtor fraudulently included assets in its

20   bankruptcy schedules that were are not even property of the Debtor.  The Debtor admitted this

21   before this Court with respect to the inflated value of assets shown on Schedule A:[8]

22          Q [by Rew Goodenow, counsel for the Secured Creditors]:  . . . [J]ust to make it clear.

23   Your estimate of the value of this property is based in part upon property – claims that you don't

---

26   [5] Exhibit "B" hereto, filed March 23, 2010, of which the Court is requested to take judicial notice.

    [6] Exhibit "B" to the Declaration of Mark Mueller, concurrently filed herewith (the "Mueller Declaration") are

27   excerpts from the Debtor's 10-Q filing for the fiscal quarter ended October 31, 2009, the most recent 10-Q filed by

    the Debtor.

    [7] See Exhibit "F" to Mueller Declaration.

28   [8] Id.

4

1   own, Firstgold doesn't own. Right?

2       A [Debtor's CEO, Terry Lynch]: Right.

3   March 10, 2010 Transcript, pg. 61, lns. 8 – 12, Exhibit "A" hereto.

4       In addition, as set forth below, the Debtor has made inaccurate and baseless statements

5   regarding the time within which the Debtor can develop Relief Canyon and put the mine into

6   production. These discrepancies and misleading statements again are indicative of management's

7   inappropriate conduct – past and present.     Moreover, due to the fraud and other

8   misrepresentations made to the Secured Creditors relating to, among other things, the presence

9   and value of the Debtor's purported gold reserves and the feasibility of its false business model to

10  mine those reserves, the Secured Creditors have sued a number of members of the Debtor's

11  management.     Since filing the complaint, the Secured Creditors have learned of other

12  misrepresentations, including the Debtor's earlier false representation that permits exist that

13  would allow the Debtor to mine the pit.  In fact, the Debtor does not have such a permit.

14  Moreover, as set forth in the Klepfer Declaration, it would take anywhere from 15 to 18 months

15  or more for the Debtor to obtain such mining permits, assuming adequate funding and

16  management was competent to manage the process through to a success - which history shows is

17  an incorrect assumption.

18      Permitting the Debtor to continue to survive by making unsubstantiated, misleading

19  and/or deceptive statements to this Court and creditors is adding insult to the injury already

20  visited upon the Secured Creditors and the creditors and investors who have seen over $75

21  million consumed by this Debtor – only to end up in a bankruptcy case with no money, no mining

22  operations, and no tangible progress toward a viable business plan..

23      For these reasons, the Debtor's management should be removed, this case should be

24  converted to chapter 7, and an independent trustee can liquidate the Relief Canyon mine in a sales

25  process under 11 U.S.C. § 363 by which a third party with the requisite expertise, funding, and

26  business model can acquire the Relief Canyon mine.  Alternatively, the Secured Creditors should

27  be given relief from the automatic stay for cause.

28  ///

5

## II.

## ARGUMENT

### A.    Brief Background.

#### 1.    Amount owed to Secured Creditors.

Pursuant to that certain "Note and Warrant Purchase Agreement" between the Secured Creditors and the Debtor dated August 7, 2008 and documents related thereto (the "Loan Documents"),[9] the Secured Creditors were owed as of the Petition Date no less that $15,510,496 and $3,847,466.17, respectively in principal, interest, charges and fees, and in the aggregate $19,357,961.72 (the "Loan Indebtedness"). The Loan Indebtedness includes certain, but not all, unliquidated, accrued and unpaid fees, charges, interest or penalties. The Debtor has not disputed the amount of the Loan Indebtedness.

#### 2.    Secured Creditors are under secured.

As security for the payment of all amounts due under the Loan Documents, the Debtor granted to the Secured Creditors, *inter alia*, a senior security interest in all tangible real and personal property assets and intangible assets of the Debtor. As set forth above, the Debtor's bankruptcy schedules are wholly unreliable with respect to the value of the Debtor's assets. However, according the Debtor's public filings as set forth above, the Debtor's assets are less than $18 million. Therefore, there is no equity in the Debtor's assets. This Court recognized that the Secured Creditors were under secured at the March 10, 2010 hearing. March 10, 2010 Transcript, pg. 67, lns. 5 – 7, Ex. "A" hereto.

#### 3.    Misrepresentations to the Secured Creditors – pre-petition.

Not long after the Secured Creditors loaned money to the Debtor, however, the Secured Creditors discovered that the Debtor had made a series of fraudulent misrepresentations upon which the Secured Creditors relied in entering into its loan transaction with the Debtor.

On June 23, 2009, the Secured Creditors commenced litigation against the Debtor and certain representatives of the Debtor by filing a complaint in the United States District Court for

---

[9]    Certain of the Loan Documents are annexed as Exhibits "G" through "J" to the Mueller Declaration.

1    the Southern District of New York (the "Complaint") alleging violations of Section 10(b) and

2    20(a) of the Securities Exchange Act of 1934, fraud and negligent misrepresentation in

3    connection with the Secured Creditors' business dealings with the Debtor. A true copy of the

4    Complaint is annexed to the concurrently filed Declaration of Mark Mueller (the "Mueller

5    Declaration") as Exhibit "A". As set forth in great detail therein, the Secured Creditors agreed to

6    lend funds to the Debtor based on misrepresentations by the Debtor with respect to the Debtor's

7    expected recovery of gold, including the Debtor's ore grades and recovery levels in the "heaps" at

8    the Relief Canyon mine, certain anti-dilution provisions in pre-existing warrants granted by the

9    Debtor to third parties, and the Debtor's overall business plan, budgets, and financial and mining

10   prospects.

11        As set forth in the Complaint, the Secured Creditors were fraudulently induced to enter

12   into the Loan Documents. Further, after the Complaint was filed, it was discovered by the

13   Secured Creditors that additional fraudulent misrepresentations were made to the Secured

14   Creditors. In particular, the Debtor represented to the Secured Creditors that mining permits

15   existed with respect to mining the pit at the Relief Canyon mine; however, as set forth in the

16   Klepfer Declaration, no such mining permits exist. Klepfer Declaration, pp. 13 – 15, ¶¶ 22 – 31.

17        **4.    Post-Petition misrepresentations to this Court and creditors.**

18        The Debtor is continuing its charade with respect to its ability to rehabilitate Relief

19   Canyon from its current status as a closed mine to a profitable mining operation in the space of

20   six to nine months. As explained above, the Debtor has admittedly filed deceptive bankruptcy

21   schedules, overstating its assets by over \$83 million when compare to its most recent SEC public

22   filings. Mr. Lynch testified in this Court that he signed bankruptcy schedules that included asset

23   values that relate to assets of third parties – namely Newmont and Victoria! Further, the Debtor's

24   statements about prospects for developing the Relief Canyon mine are wholly contrary to the only

25   expert testimony offered in this case. As set forth below and more fully in the Klepfer

26   Declaration, these types of statements (that have already been made in the record of this case)

27   have no evidentiary basis and are wholly contradicted by both the history and current status of the

28   Relief Canyon mine. Indeed, Mr. Klepfer does not believe that meaningful mining operations can

7

1  commence before a 15 to 18 month time frame. Klepfer Declaration, p.2, ¶2, lns. 20 – 22.

2       **B.    Cause Exists to Convert This Chapter 11 Case to Chapter 7.**

3       Under 11 U.S.C. § 1112(a)(4)(A) cause under § 1112(a) is established where there is a

4  "substantial or continuing loss to or diminution of the estate and the absence of a reasonable

5  likelihood of rehabilitation."

6            **1. This bankruptcy estate is sustaining continuing losses and diminution.**

7       The Debtor is continuing to incur administrative expenses that have not resulted in any

8  measurable concomitant value to the estate.  In addition to the $350,000 of administrative

9  expense priority debt that this Court recently authorized, the Debtor has employed two law firms:

10  Belding Harris & Petroni, its general counsel and Duncan Linn & Wade as special counsel.  As

11  long as this case stays in chapter 11, the Debtor will continue to incur legal fees and costs.  The

12  Debtor is also incurring substantial monthly operating losses.  According to the Debtor's Monthly

13  Operating Report for the period ending February 28, 2010, the Debtor incurred a **one month loss**

14  **of over $473,000**.  See Exhibit "B" hereto. There is no end in sight for the management's desire

15  to keep spending other people's money for its own self-serving interests – despite Mr. Lynch's

16  statements to the Court that he would not need more than 60 days to propose a viable plan.

17       In addition, unless these assets are sold by way of a chapter 7 auction to a third party who

18  is experienced and serious about the development of the mine, all creditors bear the risk of a

19  precipitous further devaluation of the estate's assets.  Indeed, if the Debtor squanders additional

20  millions of dollars of investor money (and a period of years) by way of further mismanagement

21  and fails to properly develop the Relief Canyon mine pit (since the heaps are not an economically

22  viable resource), then it is likely to be much more difficult to generate enough interest for yet

23  another serious investor in the future.  Therefore, permitting current management to remain in

24  charge of the Relief Canyon mine is itself harmful to the estate's assets and prospects for creditor

25  recovery.  Finally, all stakeholders remain subject to the unknowable future fluctuations in gold

26  prices.

27  ///

28  ///

8

1    **2.    The Debtor has not demonstrated a reasonable likelihood of**
2    **rehabilitation in this case nor is it able to formulate or perform under a feasible**
3    **business plan.**

4    There is no reasonable likelihood for the Debtor to achieve a successful reorganization in
5    this case. As set forth more fully in the Klepfer Declaration, the Relief Canyon mine has been
6    mismanaged with respect to every important stage of the mining process.

7        a.    The Debtor is not maintaining and improving "land status".

8    Maintaining the existing mining claims in good standing is essential to preserving
9    the "right" to enter the public lands to develop any mineral resources on the property. There are a
10   large number of claims required to adequately cover the purported mineral resources at Relief
11   Canyon. Due to the Debtor's precarious financial situation with no demonstrable ability to raise
12   sufficient funds to support an extended development process, there is a substantial risk that the
13   Debtor will not be able to pay federal annual fees to maintain the claims issued by the Bureau of
14   Land Management (the "BLM").    The fees may be as much as $100,000 and are due in
15   September, 2010.

16   Without sufficient mining claims to cover any mineral resources, it would not be possible
17   for the Debtor to move forward to develop any mineral deposits. Moreover, if the Debtor were to
18   default on maintaining the mining claims – which is highly likely without a reliable source of
19   funding – the Debtor would not be able to continue to remain on the public lands and may be
20   forced to initiate closure of the mining facility.    In addition, the BLM could also declare a
21   default, take over the project, call the bonds currently securing the reclamation costs and initiate
22   closure of the Relief Canyon facility.

23   Due to these risks, the Debtor is not in a position to maintain or improve the land status
24   which is a necessary first step to proceeding with mining activities at Relief Canyon.

25       b.    The Debtor has not established any proven mineral resources.

26   Of course, the existence of adequate mineral resources is the bedrock requirement for this
27   reorganization to have any chance of success.    However, no proven mineral resource base exists.
28   Terrence Lynch, the Debtor's chief executive officer, admitted in his recent deposition that there

9

1   is no certified estimate of the mineral resource base at Relief Canyon." Lynch Depo., pg. 63, lns.

2   15 – 19, annexed as part of Exhibit "D" to the Mueller Declaration.

3        Both the United States and Canada have fairly stringent requirements for reporting

4   resources and reserves in public companies.   The United States Securities Exchange Commission

5   has adopted more stringent regulations that its Canadian counterpart – for example, there is no

6   "resource" reporting permitted in the United States. The SEC only allows the term "mineralized

7   material" or "reserves". In Canada, they use a process called "National Instrument 43101" that

8   provides a third party review of a project.   Despite these requirements, the Debtor has not

9   completed the initial and critical step of a obtaining a third-party analysis of the mineral resource

10   base. Without an independent audit, review and report on the mineral resources, all future efforts

11   to develop the mine and go into operation will be futile.

12        To establish that there are mineable reserves for purposes of SEC reporting, the Debtor

13   would have to do substantial work including additional drilling, metallurgical testing, and

14   economic mine evaluation and the mine permitting process would have to be close to completion.

15   Not only is the Debtor nowhere near completing its permitting process (as discussed below), but

16   there is no source of funding to accomplish the work that needs to be done to establish an

17   adequate mineral resource base.

18        Competent geologic consultants have worked on the Relief Canyon project.   Moreover,

19   for reasons that defy explanation, after years of having control over Relief Canyon, spending

20   millions of dollars of debt and equity financing, and conducting drilling and other activities, the

21   Debtor's management has failed to take the necessary step of establishing proven reserves.   As a

22   result, the Debtor is not any where near meeting the SEC reporting requirements for public

23   companies.

24                    c.      There have been no appropriate metallurgical studies.

25        As set forth more fully in the Klepfer Declaration, the Debtor has not engaged in a proper

26   and systematic method to conduct its sampling and metallurgical studies.   This demonstrates the

27   Debtor's lack of organizational skills necessary to get through the metallurgical phase of

28   developing Relief Canyon.

10

1    By way of example, currently, one set of metallurgical tests was completed in June 2009
2    on two sets of samples from the mining pit presented to Kappis Cassiday & Associates, a
3    company specializing in metallurgy and other mining testing and implementation services.
4    However, information pertaining to the sample location, type of material sampled and
5    representativeness of the sample was not made available.  This geological information is critical
6    to be able to link the information to the resource and assist in directing further testing and
7    planning purposes – therefore the testing and analysis did not proceed.  In Mr. Klepfer's expert
8    opinion, it is puzzling as to why this type of preliminary metallurgical work was not completed
9    years ago. It is also not clear why geological information was not readily available to document
10   the sample selection and to validate the metallurgical test that was completed.

11   Moreover, the risk associated with depending almost solely on a small sample set for
12   mineral process design and estimated gold recovery is unacceptably high.    The Debtor's
13   management should have known this.  Ore variability and the impact of a non-representative
14   sample on gold recovery are always significant issues in any mining project.  The requisite
15   metallurgical work should be completed in conjunction with detailed geological analysis to
16   ensure the appropriate sample size is created to ensure adequate representation of the mineral
17   resource.  The number of sample sizes and amount of further testing that must ultimately be done
18   at Relief Canyon in not knowable at this time; however, the Debtor is far from completing even
19   the most rudimentary sample and geological analysis necessary to ultimately reach some
20   reasonable conclusions about the mineral resources at the mine.

21   Further, there is insufficient information to adequately support any determination of
22   potential gold recovery of the ore heaps from the current unaudited mineral resources.   The
23   Debtor has made an assumption that ore mined from the pit can and is amenable to cyanide heap
24   leaching.  However, a metallurgist has not yet derived conclusions of the one metallurgical test
25   conducted so far.  Moreover, without a geological report that correlates the sample collected,
26   there is no way to know if the samples used for testing are appropriate.

27   The Debtor also does not have a specific metallurgical plan that lays out the technical
28   investigations required to meet the overall project objective.  At this point, there is no way to

11

1  assess the time required to finish a proper evaluation of the mineral resources, after which a
2  further technical review must commence to move toward permitting, closure plans, etc.
3  Therefore, the Debtor's estimated timeframe for developing Relief Canyon are wholly unreliable
4  and speculative.

5        d.      The Debtor has not, and currently cannot, formulate the appropriate mine
6  business plan.

7        In order to properly develop a mine plan, numerous technical tests and studies need to be
8  completed to develop appropriate gold recovery and economic parameters used in the model.
9  Any mine plan for the Debtor would now be premature as none of the technical information
10 (geological resources, ore characterization, metallurgy) has been appropriately completed and
11 documented. Without a defined and audited resource and other important technical information,
12 continued mine planning is not productive.

13       The fact that only one metallurgical test has been performed, the economics used in the
14 preliminary analysis are based only on speculation and not supported by sufficient technical data
15 on gold recovery and actual tonnages of the various ore types that will be mined. There is little
16 value in the preliminary mine plan until the geology, resource, and metallurgical information is
17 properly completed and documented.

18       Properly developed mine plans must logically follow other technical assessments. Until
19 the resource, metallurgy and other important technical data are properly addressed, using any
20 interim/preliminary mine plans for project or investment decisions at this stage raises the already
21 unacceptably high risks of failure. The unknowns associated with ore tonnage, processing, and
22 gold recovery can negatively impact mine models and overall project economics. Therefore,
23 formulating a mine plan at this time would be a wasteful exercise.

24       e.      The Debtor cannot demonstrate that it will obtain necessary environmental
25 permitting within a reasonable time period in this case.

26       Environmental permitting is probably even more critical to the overall project success
27 than the technical information discussed above. Clear permitting strategies and plans are
28 necessary to ensure a realistic assessment of the permitting process and schedule. Without a

12

1  comprehensive plan and supporting documentation the actual direction being taken by the
2  company with respect to permitting is speculative, disorganized, and will result in delays.

3      Due to the lack of adequate understanding by the Debtor's management of permitting
4  issues and a detailed overall project strategy, the Debtor has changed permitting strategies
5  continually throughout its ownership of Relief Canyon. It appears that a comprehensive
6  permitting strategy was never developed or implemented. This has likely resulted in completely
7  inaccurate permitting time periods, unrealistic expectations, and an underestimation in the issues
8  to be resolved in connection with obtaining permits. This lack of planning also led to insufficient
9  technical and environmental data to support the permitting process. Much of the information
10 should have been developed years ago. The Secured Creditors believe that the filing of this
11 bankruptcy case has not changed the total inability of the Debtor to move Relief Canyon to the
12 point that it can actually obtain the necessary permits, plans, expertise and financing to open and
13 operate mining operations at Relief Canyon.

14     The permitting process generally causes the biggest delays and also creates the highest
15 level of unknown risk associated with any mining project. Mr. Klepfer concludes that it is
16 unlikely that management will be able to advance Relief Canyon toward obtaining the needed
17 permits and a feasible mining plan.

18     The Debtor has only recently started the permit amendment and application process. This
19 process did not start until the middle of 2009 and has now been suspended. Without sufficient
20 technical information to support the permitting process, there is a significant risk of delays. The
21 lack of technically supported mine planning has resulted in an ill-defined permitting process. It
22 will not be effective for the Debtor to attempt to initiate permitting when the details of the mine
23 design, metallurgical process, and ore/waste characterization are in their present state. These are
24 serious risks to the permitting process and potential delays and/or denial of the proposed action by
25 the BLM and other governmental authorities.

26     It is possible that the BLM will decide that an environmental impact statement ("EIS") is
27 required for approval. If this occurs, the permitting time period may take 3 to 4 years to get
28 agency approval with a significantly higher permitting cost. Even if an environmental assessment

13

1   ("EA") is completed by the BLM, it is still possible that the EA will identify a significant issue

2   that cannot be adequately mitigated and cause an EIS to be required.   The risk of this occurring is

3   increased because the Debtor is under scrutiny by the BLM and the Nevada Department of

4   Environmental Protection ("NDEP") over permit compliance.   There were permit compliance

5   deficiencies recently found at the heap leach facility that NDEP and the BLM wanted corrected.

6   These included items such as:

7       • The emergency generator was on site but was not set in place and operational

8       • A run-on diversion in their design needed to be rock-lined to ensure long-term stability

9       • A leak occurred in a pipeline that fed from the plant to either the heap or the barren pond

10      • Liner/ditch design on the heap leach was not operating correctly and the NDEP wanted it

11          redesigned

12  These were the kinds of items that jeopardized permit compliance.   The Debtor is informed that

13  there are still outstanding issues and a schedule of compliance exists with the agencies.   The

14  Debtor's past difficulties with maintaining compliance early on in their ownership will also play a

15  role in the agencies' review of their proposal and approval.   Therefore, there is a substantial and

16  legitimate concern regarding timely obtaining necessary permits given the Debtor's poor track

17  record.

18          f.      The Debtor has failed to show any progress with respect to developing

19  Relief Canyon into an operating mine within any reasonable timeframe and within the necessary

20  environmental compliance guidelines.

21          The Debtor has not put forth an overall comprehensive project development plan which

22  outlines the specific tasks necessary to properly advance the development of Relief Canyon.   This

23  failure to develop a plan that identifies the appropriate steps, studies, and decision making points

24  for the project constitutes a major aspect of the Debtor's mismanagement of the mine.   There are

25  very few formal reports and/or memos generated by management that provide adequate

26  background information, author of the work, and details of the project.   There is a lack of proper

27  documentation of each step in developing the mine's resource, and other technical information

28  used to make decisions and advance the project.

14

1         **3.**     **The Debtor's past economic performance demonstrates that**

2         **management cannot successfully reorganize the Debtor's operations in this chapter**

3         **11 case.**

4         The Debtor's most recently filed Form 10-Q[10] and other public filings demonstrate that

5   the Debtor has been an unmitigated economic failure from its inception and that there is no

6   business that can be successfully reorganized.  As set forth on the Form 10-Q Balance Sheet, the

7   Debtor had an accumulated deficit of nearly $58 million as of October 31, 2009.  At that time, the

8   Debtor had raised over $53 million through equity financing and had total liabilities of $22.6

9   million; however, the Debtor only had cash and other current assets of $42,375.  In Note 2 to the

10  Form 10-Q, the Debtor admits having a net loss of nearly $12 million in the nine months ending

11  October 31, 2009.  As reflected in the Form 10-Q Statement of Operations, revenues of the

12  Debtor have been negligible over the last nearly fifteen years – that revenue being related to a

13  drilling business that no longer exists.  The Debtor has never generated revenue from its mining

14  business, and the Debtor had no revenues at all for the three months ending October 31, 2009.

15        The Debtor further admits in Note 2 that since its inception "the Company has satisfied its

16  capital needs by issuing equity and debt securities".  In other words, despite having the benefit of

17  $75 million of debt and equity infused into the Company since its inception, the Debtor is still

18  unable to generate any revenues from mining operations.

19        Further, the Debtor has admitted its inability to even commence mining operations.  In the

20  Debtor's Form 10-K for the fiscal year ending January 31, 2009, the Debtor states:

21        "Although we commenced efforts to re-establish our mining business early in

22        fiscal year 2004, no mining operations were commenced and no revenue from

23        mining production was recognized during the fiscal years 2008 and 2009,

24        respectively."

25  ///

26  ///

27  _____

28  [10] Exhibit "B" to the Mueller Declaration, of which the Secured Creditors request that the Court take judicial notice.

15

1    See excerpts from Form 10-K, annexed to the Mueller Declaration as Exhibit "C". The Secured

2    Creditors are informed that no mining operations have been commenced since this public filing

3    was made approximately one year ago. In addition, the Secured Creditors are further informed by

4    the Debtor's own consultants, Enviroscientists, that the Debtor will not be able to obtain permits

5    to conduct mining operations for at least twelve months.    Therefore, there are no mining

6    operations currently being conducted – nor can there be.

7            The Debtor's dismal failure to generate any revenue at all from its mining operations can

8    also be attributed to the total lack of competency of those currently managing the Debtor. As set

9    forth in the Debtor's 10-K, Terry Lynch, the Debtor's CEO and a board member since July 2009,

10   James Kluber, the chief financial officer since 2000, and Steven Akerfeldt, Lynch's predecessor

11   and current chairman of the board have no prior experience in the mining industry. It is not

12   realistic nor is it common sense to believe that this same management can successfully reorganize

13   the Debtor. See excerpts from Form 10-K for the period ending January 31, 2009, annexed to the

14   Mueller Declaration as Exhibit "C". In addition, based on the recent testimony of Lynch, the

15   officers of the Debtor live and work a great distance from the mine. Lynch and Akerfeldt are in

16   Toronto and Kluber is in Massachusetts – all thousands of miles away. It is hard to imagine how

17   the Relief Canyon mine can be effectively managed if the CEO, the CFO and the chairman of the

18   board are all thousands of miles away from the mine itself. Lynch Depo., pg. 68, ln. 16 – pg. 70,

19   ln. 7, annexed to the Mueller Declaration as part of Exhibit "D".

20   **C.    Cause Exists To Lift the Automatic Stay**

21           Due to all of the same factors that compel a conversion of this case to chapter 7, grounds

22   exist for this Court to order that the automatic stay be lifted under 11 U.S.C. §§ 362(d)(1) and (2).

23   Section 362(d) of the Bankruptcy Code provides in pertinent part:

24               On request of a party in interest and after notice and a hearing, the court
                 shall grant relief from the stay provided under subsection (a) of this section,
25               such as by terminating, annulling, modifying, or conditioning such stay--

26               (1) for cause, including the lack of adequate protection of an interest in
                 property of such party in interest;
27

28   ///

16

(2) with respect to a stay of an act against property under subsection (a) of this section, if--

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

### 1. The interests of the Secured Creditors are not adequately protected.

For the reasons stated above, continued prosecution of this chapter 11 case will likely lead to irreparable harm and devaluation of the Debtor's estate and prospects for future mining operations at Relief Canyon. The Debtor has no economic wherewithal to protect the interests of the Secured Creditors, whose recovery is solely linked to a sale or other transaction that maximizes the value of the mineral resources at the mine. The Debtor is unable to accomplish this. Rather, the Debtor – which has survived on $75 million of other people's money before filing this case – seeks to foist the risk of an ultimate business failure onto the Secured Creditors. This is wholly inequitable. The Secured Creditors should be given relief from the automatic stay now so that they can enforce their rights of foreclosure and other rights and remedies under the Loan Documents and applicable non-bankruptcy law.

### 2. The Debtor does not have equity in the Secured Creditors' collateral and there is no reorganization in prospect.

It has been established herein and in the record of this case that the Debtor does not have equity in the assets of this estate, which are encumbered by the liens of the Secured Creditors. In addition, the Secured Creditors have also established that there is no reorganization in prospect – i.e., there is no reasonable possibility of a successful reorganization in a reasonable time.[11] For purposes of this case, the Debtor has been given a reasonable time to file a chapter 11 plan that

---

[11] "Once the movant under § 362(d)(2) establishes that he is an under secured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely showing that if there is to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means ... that there must be "'a reasonable possibility of a successful reorganization within a reasonable time.'"

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375-76, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (citations omitted).

1   the Court finds is viable and verifiable.  It has not done so.  Therefore, relief from the automatic

2   stay is appropriate.

3                                             **III.**

4                                       **CONCLUSION**

5           For the foregoing reasons, the Secured Creditors respectfully request that the Court either

6   (1) convert this chapter 11 case to one under chapter 7 of the Bankruptcy Code or (2) grant the

7   Secured Creditors relief from the automatic stay under 11 U.S.C. §§ 362(d)(1) and (2).

8

9   Dated:  March 25, 2010                    PLATINUM LONG TERM GROWTH LLC
                                              And LAKEWOOD GROUP, LLC

10

11

12                                           By: _____/s/ Daniel H. Reiss_____
                                                 Rew R. Goodenow (SBN 3722)
                                                 Parsons Behle & Latimer
13                                                       and
                                                 Daniel H. Reiss (CA SBN 150573)
14                                               Levene, Neale, Bender, Rankin
                                                   & Brill L.L.P.
15                                               Counsel to Platinum Long Term Growth
16                                               LLC and Lakewood Group, LLC

17

18

19

20

21

22

23

24

25

26

27

28

                                              18

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In Re:                  .       Docket No. BK-N 10-50215-GWZ
                        .
FIRSTGOLD CORP,         .       Reno, Nevada
                        .       March 10, 2010
        Debtor.         .       8:36:31 a.m.
. . . . . . . . . .

                      .       HEARING ON
        MOTION BY DEBTOR FOR INTERIM AND FINAL
        ORDER AUTHORIZING DEBTOR TO OBTAIN
        DEBTOR-IN-POSSESSION FINANCING UNDER
            SECTION 364(b), RULE 4001(c)
            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE GREGG W. ZIVE
        UNITED STATES BANKRUPTCY JUDGE

Electronic Court Recorder:      Sylvia Tilton

Transcription:                  Typewrite Services Inc.
                                P.O. Box 5804
                                Sparks, Nevada 89432-5804

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

APPEARANCES:

For the Debtor:                    Belding, Harris &
                                        Petroni, Ltd.
                                   BY: STEPHEN R. HARRIS, ESQ.
                                   BY: CHRIS D. NICHOLS, ESQ.
                                   417 W. Plumb Lane
                                   Reno, Nevada 89509

Also Present:                      TERRY LYNCH, CEO
(By telephone)

For Platinum Value                 Parsons, Behle & Latimer
Funds and Lakewood:                BY: REW R. GOODENOW, ESQ.
                                   50 W. Liberty St., Ste. 750
                                   Reno, Nevada 89501

                                        -and-

Also Present:                      Levene, Neale, Bender,
(By telephone)                     Rankin & Brill
                                   BY: DANIEL H. REISS, ESQ.
                                   10250 Constellation Blvd.
                                        Suite 1700
                                   Los Angeles, CA 90067-6200

For the Office of                  WILLIAM B. COSSITT, ESQ.
United States Trustee:             300 Booth St., Ste. 2129
                                   Reno, Nevada 89509

21

16

1        I saw nothing inconsistent with what Mr. Lynch
2   said then at his deposition and what he said here.
3        I do understand the distinctions in the publicly
4   filed reports with the Securities & Exchange Commission as
5   opposed to what's in the petition regarding values, etc.
6        And it is relatively obvious to me that in the
7   absence of having a substantial verifiable viable plan,
8   whether it's new money, a purchase by the end of this
9   month, that I will hold the debtor to what I was told and I
10  will look at either converting or dismissing early in
11  April.
12        So those are my tentative conclusions.
13        Mr. Harris.
14        MR. HARRIS:  Your Honor, I don't have any issues
15  with anything the Court said.  And we know we're on a short
16  string right now as far as putting something --
17        THE COURT:  Well, I need -- let's take a look at
18  that budget.  I mean let's take a look at the reality.
19        MR. HARRIS:  Your Honor, would it be okay if we
20  just put Mr. Lynch on the stand?
21        THE COURT:  Sure.
22        MR. HARRIS:  Swear him in?
23        THE COURT:  Let's do --
24        MR. HARRIS:  Okay.
25        THE COURT:  I'd rather do that.

60
Pennington - Cross
1  with Newmont, you know, in December, that we had provided
2  to Platinum and others.  And when the Northwest deal
3  collapsed we basically, you know, contacted Newmont and
4  told them about our plans for, you know, Chapter 11 and
5  etc. and that we'd be coming back with them to discuss a
6  restructured agreement.  And so that was the tenor of the
7  discussions.

8  Q   All right.

9          And the reason for the discussions initially with
10 Newmont and Victoria Mining concerning acquiring their
11 interests is that they have interests that adjoin and in
12 some cases separate the claims owned by Firstgold at the
13 Relief Canyon site.  Right?

14 A   They don't separate our claims, but they're contiguous
15 I think.

16 Q   Well, let's focus for a moment on the claims that are
17 located up on the benches at the existing pit and the heap
18 leaching operation.

19          There are claims of Newmont or Victoria that are
20 physically located between those two sites, are there not?
21 A   Yes.  But it's -- I think there's -- you know, our
22 property is contiguous too.  You know, do we have sectors
23 where that would be more efficient to go through their
24 land?  Yes.  That was the discussion.

25 Q   And in the estimates of the value and extent of your

61
Pennington - Cross
1  resource have you in those estimates included the
2  neighboring property, neighbored claims, the resource
3  located on those claims, in your estimates of the total
4  value of the available resource on the property?
5  A    Yes.  Yes, we have in terms of the -- based upon, you
6  know, paying them the ten thousand ounces.  Yeah.
7  Q    Right.
8          So that your -- just to make it clear.  Your
9  estimate of the value of this property is based in part
10 upon property -- claims that you don't own, Firstgold
11 doesn't own.  Right?
12 A    Right.
13 Q    Is there any revenue currently from the services
14 performed by the lab for Great Basin; do you know?
15 A    Yes.
16 Q    Is that break-even, profit?  What's the relationship?
17 A    Roughly break-even.  A small profit has been run the
18 last couple of months.  They've been instructed to -- that,
19 you know, it needs to carry itself.  That we weren't in any
20 position to subsidize it.  So.
21 Q    And the lab equipment, is that owned by Firstgold or is
22 it owned by someone else?
23 A    It's owned by Firstgold.
24 Q    And is it necessary for the First for your efforts to
25 find a third-party deal, a purchaser for the Firstgold

67

1  third-party services.  I question whether that's necessary
2  or appropriate.

3         The debtor has mine claim payments coming up in
4  the fall that it's going to need to make and other expenses
5  to maintain this property as a salable mining property for
6  the benefit of its secured creditors, which it's becoming
7  painfully apparent are in significant jeopardy from
8  continued operations.

9         If the Court is --

10        THE COURT:  What is that jeopardy?

11        MR. GOODENOW:  The jeopardy is that first of all
12  mining, as the Court is well aware, presents a very
13  significant risk for environmental contamination.  And so
14  the fed -- both the federal and state governments through
15  the NDP maintain a very tight regulatory control through
16  which they may exercise power over the -- both the permits
17  for the property, any existing permits --

18        THE COURT:  And aren't the purpose of the -- one
19  of the primary purposes of the requested financing is to
20  satisfy those obligations to protect, for lack of a better
21  word, the integrity of the operation.  Its care and
22  maintenance.  As I understand it, do the work that's
23  necessary to ensure compliance with reg -- with the
24  regulators, whether be NDP or BLM.  That you protect the
25  claims, patented and unpatented.  That you do the work

69

1  best business judgment the opportunity to solicit and see
2  if there is the potential for finding a joint venture,
3  additional funding or additional investors.

4          And the question for me is if that -- whether
5  that's worth thirty-five thousand dollars for Mr. Lynch and
6  Mr. Gluber.  I heard the testimony.  And I wrestled with
7  that.

8          And I don't think -- and frankly, I credit the
9  witness with being candid.  His work is not necessary for
10 care and maintenance.  And I --

11         MR. GOODENOW:  That's right.

12         THE COURT:  And I totally agree.  And but I think
13 I've being asked to approve this additional money for more
14 than just that.  Because what they're really saying is if
15 you shut us down and if there are investors and we can't
16 produce this data and we can't show them the mine--of
17 course these folks aren't at the mine--that would be up to
18 Mr. Tibbles probably or Mr. Beck, whoever is at the mine to
19 show them the mine;

20         But if we can't produce these documents and
21 current financials that nobody can do due diligence and
22 they're under both a self-imposed and a Court-imposed
23 deadline for getting this done.  And they're saying they
24 need the ability to do that.

25         And that's what I've heard here today.  I don't

70

1  think I've missed much.

2      MR. GOODENOW:  No.  I think, your Honor, you're
3  thinking about the right way and you see -- and Mr. Lynch
4  was candid in his responses to my questions.  And obviously
5  I focused on what's necessary for the short term.

6      THE COURT:  And that's exactly what I wanted to
7  hear.  And I appreciate the examination.

8      MR. GOODENOW:  What I'd like to turn our attention
9  to now is part three of the Court's tentative conclusions.
10  And that is that, your Honor, you focused on allowing the
11  additional expenditures.  And I appreciate your efforts to
12  contain them.

13      And then you also talked about the -- what is
14  necessary in terms of the care and maintenance.

15      THE COURT:  Well, I will tell you right now that
16  we're down to a hundred and twenty-five thousand dollars.

17      We eliminate the lab as included on -- and I don't
18  care what the printout says because there was no
19  authentication for those figures.

20      I am willing to accept the testimony of the
21  witness regarding Exhibit A to his declaration.

22      I'm eliminating the lab payroll and I'm
23  eliminating the twenty thousand dollars for Enviro
24  Scientists.  And that's about fifty-two thousand dollars.
25  If you subtract that you're about a hundred and twenty-

27

1  three thousand dollars.

2         Then as I listened to it more and more, I do think
3  that the work that Mr. Gluber and Mr. Lynch provide is of
4  benefit to the debtor while it attempts to reorganize.  And
5  that is the purpose.  And I do not have a motion to dismiss
6  in front of me or to convert.  So.

7         And I -- the law does require me to give some
8  deference to the business judgment of the debtor.

9         I would say though that I think I would limit
10  those payments to the priority amounts as set forth in
11  Section 507.  Because I -- you know, this is an entity
12  that's in great distress.  That amount is ten thousand nine
13  hundred and fifty dollars a month.  I think that that's
14  probably sufficient and it prevents any further dilution.

15         So if I were to use that amount, which is twenty-
16  two, that's an additional fourteen thousand dollars.  Which
17  means that I am prepared at this time to allow a hundred
18  and ten thousand dollars to be erased.

19         MR. GOODENOW:  Your Honor, what I'm --

20         THE COURT:  That's just to let you know what I was
21  thinking about.

22         MR. GOODENOW:  I -- I appreciate that.

23         THE COURT:  And if after April 1st that priority
24  amount goes above eleven, he adjustment that are required
25  become effective April 1st.

72

1          MR. GOODENOW:  Now, your Honor, you mentioned a
2     third item.

3          THE COURT:  I just wanted to let you know
4     that's -- as I listened and listened to you that's kind of
5     where I'm -- I thought the examination was helpful to me.
6     I see the benefit from retaining those individuals.  I
7     don't think they need to get the full thirty-five thousand.
8      I think the twenty-two thousand is sufficient.

9          I think the people at the mine have already taken
10    a sufficient deduction in the amount of their income.  I
11    fail to see why they should be the only ones that are
12    adversely affected by this filing.

13         MR. GOODENOW:  I think that's right, your Honor.
14         I wanted to focus on a third thing though.  And I
15    appreciate that there is no motion to convert or dismiss in
16    front of you today.

17         THE COURT:  No.  But I -- you also heard what I
18    said at the beginning of this hearing, what will occur if
19    we don't have something by the end of March or first week
20    of April.

21         MR. GOODENOW:  I did.  And that's why I wanted to
22    mention it so that we did not neglect to include something
23    with respect to that in the order, either setting of a
24    hearing for order to show cause --

25         THE COURT:  I set a status conference.  I'm not

79

```
 1                          CERTIFICATE
 2
 3          I certify that the foregoing is a correct
 4   transcript from the digital sound recording of the
 5   proceedings in the above-entitled matter.
 6
 7   /s/ Marjorie G. Davall              March 16, 2010
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT "B"

ELECTRONICALLY FILED BY
BELDING, HARRIS & PETRONI, LTD
ON ____ 3/23/10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

n re: [CASE NAME]

*Firstgold Corp.*

Case No. _10 - 50215_

CHAPTER 11
MONTHLY OPERATING REPORT
(GENERAL BUSINESS CASE)

## SUMMARY OF FINANCIAL STATUS

MONTH ENDED: _2/28/2010_       PETITION DATE: _1/27/2010_

Debtor in possession (or trustee) hereby submits this Monthly Operating Report on the Accrual Basis of accounting (or if checked here ___ the Office of the U S Trustee or the Court has approved the Cash Basis of Accounting for the Debtor)

Dollars reported in    $1

| | *1ST Month* End of Current Month | | End of Prior Month | As of Petition Filing |
|---|---|---|---|---|
| Asset and Liability Structure | **Month** | | **Month** | |
| a. Current Assets | 3,004,154 | $0 | | |
| b. Total Assets | 104,371,143 | $0 | | |
| c. Current Liabilities | 192,830 | $0 | | |
| d. Total Liabilities | 32,145,705 | $0 | | |

| | | | | Cumulative (Case to Date) |
|---|---|---|---|---|
| Statement of Cash Receipts & Disbursements for Month | **Current Month** | | **Prior Month** | |
| a. Total Receipts | 199,195 | $0 | | $0 |
| b. Total Disbursements | 225,752 | $0 | | $0 |
| c. Excess (Deficiency) of Receipts Over Disbursements (a - b) | (26,558) | $0 | $0 | $0 |
| d. Cash Balance Beginning of Month | 75,951 | $0 | | $0 |
| e. Cash Balance End of Month (c + d) | 49,393 | $0 | $0 | $0 |

| | **Current Month** | | **Prior Month** | **Cumulative (Case to Date)** |
|---|---|---|---|---|
| Profit/(Loss) from the Statement of Operations | (463,058) | $0 | | |
| Account Receivables (Pre and Post Petition) | 39,620 | $0 | | |
| Post-Petition Liabilities | 192,830 | $0 | | |
| Past Due Post-Petition Account Payables (over 30 days) | -0- | $0 | | |

At the end of this reporting month:

| | | Yes | No |
|---|---|---|---|
| 1 | Have any payments been made on pre-petition debt, other than payments in the normal course to secured creditors or lessors? (if yes, attach listing including date of payment, amount of payment and name of payee) | | X |
| 2 | Have any payments been made to professionals? (if yes, attach listing including date of payment, amount of payment and name of payee) | X | |
| 10. | If the answer is yes to 8 or 9, were all such payments approved by the court? | X | |
| 11 | Have any payments been made to officers, insiders, shareholders, relatives? (if yes, attach listing including date of payment, amount and reason for payment, and name of payee) | X | |
| 12 | Is the estate insured for replacement cost of assets and for general liability? | X | |
| 13 | Are a plan and disclosure statement on file? | | X |
| 14 | Was there any post-petition borrowing during this reporting period? | X | |

15  Check if paid: Post-petition taxes  X ;     U S Trustee Quarterly Fees _____ ; Check if filing is current for Post-petition
    tax reporting and tax returns:  X .
    (Attach explanation, if post-petition taxes or U S Trustee Quarterly Fees are not paid current or if post-petition tax reporting and tax return filings are not current.)

I declare under penalty of perjury I have reviewed the above summary and attached financial statements, and after making reasonable inquiry believe these documents are correct.

Date: _3/22/2010_

Responsible Individual

Revised 17/08

STATEMENT OF OPERATIONS
(General Business Case)
For the Month Ended _February 28, 2010_

*FIRST MONTH*

| | Current Month | | | | Cumulative (Case to Date) | Next Month Forecast |
|---|---|---|---|---|---|---|
| Actual | Forecast | Variance | | | | |
| | | | | Revenues: | | |
| 34,898 | -0- | 34,898 | $0 | 1 Gross Sales | | |
| | | | $0 | 2 less: Sales Returns & Allowances | | |
| 34,898 | $0 | -0- | $0 | 34,898 | $0 | 3 Net Sales | $0 | $0 |
| $0 | | | | | | |
| 34,898 | $0 | $0 | 34,898 | $0 | 4 less: Cost of Goods Sold (Schedule 'B') | | |
| | | | | 5 Gross Profit | $0 | $0 |
| 1,278 | -0- | 1,278 | $0 | 6 Interest | | |
| | | | $0 | 7 Other Income | | |
| | | | $0 | 8 | | |
| | | | $0 | 9 | | |
| 36,176 | $0 | $0 | 36,176 | $0 | 10 Total Revenues | $0 | $0 |
| | | | | Expenses: | | |
| 32,905 | 37,768 | (4,263) | $0 | 11 Compensation to Owner(s)/Officer(s) | | |
| 35,124 | 58,648 | (23,524) | $0 | 12 Salaries | | |
| | | | $0 | 13 Commissions | | |
| | | | $0 | 14 Contract Labor | | |
| | | | | Rent/Lease | | |
| | | | $0 | 15 Personal Property | | |
| | | | $0 | 16 Real Property | | |
| 5,100 | 9,475 | (4,375) | $0 | 17 Insurance | | |
| | | | | 18 Management Fees | | |
| 110,000 | 110,000 | -0- | $0 | 19 Depreciation | | |
| | | | | Taxes | | |
| 16,777 | 8,860 | 7,917 | $0 | 20 Employer Payroll Taxes | | |
| | | | $0 | 21 Real Property Taxes | | |
| | | | $0 | 22 Other Taxes | | |
| | | | $0 | 23 Other Selling | | |
| 18,126 | 9,500 | 8,626 | $0 | 24 Other Administrative | | |
| 271,263 | -0- | 271,263 | $0 | 25 Interest | | |
| 16,656 | 17,500 | (844) | $0 | 26 Other Expenses _General operating_ | | |
| 2,871 | -0- | 3,871 | $0 | 27 _Travel_ | | |
| | | | $0 | 28 | | |
| | | | $0 | 29 | | |
| | | | $0 | 30 | | |
| | | | $0 | 31 | | |
| | | | $0 | 32 | | |
| | | | $0 | 33 | | |
| | | | $0 | 34 | | |
| 509,822 | $0 | 251,751 | $0 | 259,071 | $0 | 35 Total Expenses | $0 | $0 |
| (473,646) | $0 | (251,751) | $0 | (221,895) | $0 | 36 Subtotal | $0 | $0 |
| | | | | Reorganization Items: | | |
| | | | $0 | 37 Professional Fees | | |
| | | | $0 | 38 Provisions for Rejected Executory Contracts | | |
| | | | $0 | 39 Interest Earned on Accumulated Cash from Resulting Chp 11 Case | | |
| | | | $0 | 40 Gain or (Loss) from Sale of Equipment | | |
| | | | $0 | 41 U.S. Trustee Quarterly Fees | | |
| | | | $0 | 42 | | |
| $0 | $0 | $0 | 43 Total Reorganization Items | $0 | $0 |
| (473,646) | $0 | (251,751) | $0 | (221,895) | $0 | 44 Net Profit (Loss) Before Federal & State Taxes | $0 | $0 |
| | | | $0 | 45 Federal & State Income Taxes | | |
| (473,646) | $0 | (251,751) | $0 | (221,895) | $0 | 46 Net Profit (Loss) | $0 | $0 |

Attach an Explanation of Variance to Statement of Operations (For variances greater than +/- 10% only)

Revised 1/1/98

33

## BALANCE SHEET
### (General Business Case)
For the Month Ended *February 28, 2010*

Assets

| | | From Schedules | Market Value | |
|---|---|---|---|---|
| | **Current Assets** | | | |
| 1 | Cash and cash equivalents - unrestricted | | *49,393* | |
| 2 | Cash and cash equivalents - restricted | | *2,858,704* | |
| 3 | Accounts receivable (net) | A | *34,620* | $0 |
| 4 | Inventory | B | | $0 |
| 5 | Prepaid expenses | | *11,437* | |
| 6 | Professional retainers | | *50,000* | |
| 7 | Other: | | | |
| 8 | | | | |
| 9 | **Total Current Assets** | | *3,004,154* | $0 |
| | **Property and Equipment (Market Value)** | | | |
| 10 | Real property *familiarity with market price* | C | *1,800,000* | $0 |
| 11 | Machinery and equipment *familiarity w/market price* | D | *11,200,000* | $0 |
| 12 | Furniture and fixtures *familiarity w/market price* | D | *50,000* | $0 |
| 13 | Office equipment *value of software purchased* | D | *50,000* | $0 |
| 14 | Leasehold improvements *DCF model of ore deposits* | D | *86,000,000* | $0 |
| 15 | Vehicles *40% of cost* | D | *400,000* | $0 |
| 16 | Other: | D | | |
| 17 | | D | | |
| 18 | | D | | |
| 19 | | D | | |
| 20 | | D | | |
| 21 | **Total Property and Equipment** | | *99,500,000* | $0 |
| | **Other Assets** | | | |
| 22 | Loans to shareholders | | | |
| 23 | Loans to affiliates | | | |
| 24 | *Asset retirement costs* | | *2,866,989* | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | **Total Other Assets** | | *2,866,989* | $0 |
| 29 | **Total Assets** | | *105,371,143* | $0 |

NOTE:

Indicate the method used to estimate the market value of assets (e.g., appraisals; familiarity with comparable market prices, etc.) and the date the value was determined.

Revised 12/98

34

## Liabilities and Equity
(General Business Case)

Liabilities From Schedules

Post-Petition

Current Liabilities

| | | | | |
|---|---|---|---|---|
| 30 | Salaries and wages | | | |
| 31 | Payroll taxes | | | |
| 32 | Real and personal property taxes | | | |
| 33 | Income taxes | | | |
| 34 | Sales taxes | | | |
| 35 | Notes payable (short term) | | | |
| 36 | Accounts payable (trade) | A | 17,830 | $0 |
| 37 | Real property lease arrearage | | | |
| 38 | Personal property lease arrearage | | | |
| 39 | Accrued professional fees | | | |
| 40 | Current portion of long-term post-petition debt (due within 12 months) | | 175,000 | |
| 41 | Other: | | | |
| 42 | | | | |
| 43 | | | | |
| 44 | **Total Current Liabilities** | | 192,830 | $0 |
| 45 | Long-Term Post-Petition Debt, Net of Current Portion | | | |
| 46 | **Total Post-Petition Liabilities** | | 192,830 | $0 |
| | Pre-Petition Liabilities (allowed amount) | | | |
| 47 | Secured claims | F | 20,252,133 | $0 |
| 48 | Priority unsecured claims | F | 1,219,331 | $0 |
| 49 | General unsecured claims | F | 10,481,411 | $0 |
| 50 | **Total Pre-Petition Liabilities** | | 31,952,875 | $0 |
| 51 | **Total Liabilities** | | 32,145,705 | $0 |
| | **Equity (Deficit)** | | | |
| 52 | Retained Earnings/(Deficit) at time of filing | | <69,111,697> | |
| 53 | Capital Stock | | 196,769 | |
| 54 | Additional paid-in capital | | 53,455,313 | |
| 55 | Cumulative profit/(loss) since filing of case | | <473,646> | |
| 56 | Post-petition contributions/(distributions) or (draws) | | | |
| 57 | | | | |
| 58 | Market value adjustment | | 89,158,699 | |
| 59 | **Total Equity (Deficit)** | | 73,225,438 | $0 |
| 60 | **Total Liabilities and Equity (Deficit)** | | 105,371,143 | $0 |

Revised 1/1/98

35

## SCHEDULES TO THE BALANCE SHEET
(General Business Case)

Schedule A

Accounts Receivable and (Net) Payable

| Receivables and Payables Agings | Accounts Receivable [Pre and Post Petition] | Accounts Payable [Post Petition] | Past Due Post Petition Debt |
|---|---|---|---|
| 0-30 Days | 31,060 | 17,831 | |
| 31-60 Days | 860 | | |
| 61-90 Days | | | ☞ $0 |
| 91+ Days | 2,700 | | |
| Total accounts receivable/payable | 34,620 $0 | 17,831 $0 | |
| Allowance for doubtful accounts | $0 | | |
| Accounts receivable (net) | 34,620 $0 | | |

Schedule B        N/A
Inventory/Cost of Goods Sold

| Types and Amount of Inventory(ies) | Inventory(ies) Balance at End of Month | Cost of Goods Sold | |
|---|---|---|---|
| | | Inventory Beginning of Month | |
| | | Add - | |
| Retail/Restaurants - | | Net purchase | |
| Product for resale | | Direct labor | |
| | | Manufacturing overhead | |
| Distribution - | | Freight in | |
| Products for resale | | Other: | |
| Manufacturer - | | | |
| Raw Materials | | | |
| Work-in-progress | | Less - | |
| Finished goods | | Inventory End of Month | |
| | | Shrinkage | |
| Other - Explain | | Personal Use | |
| | | Cost of Goods Sold | $0 |
| TOTAL | $0 | | |

### Method of Inventory Control
Do you have a functioning perpetual inventory system?
    Yes ____ No ____
How often do you take a complete physical inventory?

Weekly ____
Monthly ____
Quarterly ____
Semi-annually ____
Annually ____
Date of last physical inventory was ____

Date of next physical inventory is ____

### Inventory Valuation Methods
Indicate by a checkmark method of inventory used

Valuation methods -
    FIFO cost ____
    LIFO cost ____
    Lower of cost or market ____
    Retail method ____
    Other ____
    Explain

Revised 1/1/98

36

Schedule C
Real Property

| Description | Cost | Market Value |
|---|---|---|
| Office building, Lovelock, NV | 474,484 | 300,000 |
| Lab building, Lovelock, NV | 1,149,310 | 1,500,000 |
| | | |
| | | |
| Total | 1,623,794 $0 | 1,800,000 $0 |

Schedule D
Other Depreciable Assets

| Description | Cost | Market Value |
|---|---|---|
| Machinery & Equipment - | | |
| Mining equipment | 2,499,287 | 2,000,000 |
| Crushing equipment | 2,609,183 | 2,000,000 |
| Processing plant & equipment | 4,263,925 | 7,000,000 |
| Lab equipment | 242,900 | 200,000 |
| Total | 9,615,385 $0 | 11,200,000 $0 |
| | | |
| Furniture & Fixtures - | | |
| Office furniture & Fixtures | 221,403 | 50,000 |
| | | |
| | | |
| Total | 221,403 $0 | 50,000 $0 |
| | | |
| Office Equipment - | | |
| Software | 118,262 | 50,000 |
| | | |
| Total | $0 | $0 |
| | | |
| Leasehold Improvements - | | |
| site improvements | 1,542,885 | 26,000,000 |
| | | |
| Total | 1,542,885 $0 | 26,000,000 $0 |
| | | |
| Vehicles - | | |
| Trucks | 929,352 | 400,000 |
| | | |
| Total | 929,352 $0 | 400,000 $0 |

Revised 1/7/98

Schedule E
Aging of Post-Petition Taxes
(As of End of the Current Reporting Period)

| Taxes Payable | 0-30 Days | 31-60 Days | 61-90 Days | 91+ Days | Total |
|---|---|---|---|---|---|
| Federal | | | | | |
| Income Tax Withholding | | | | | $0 |
| FICA - Employee | | | | | $0 |
| FICA - Employer | | | | | $0 |
| Unemployment (FUTA) | | | | | $0 |
| Income | | | | | $0 |
| Other (Attach List) | | | | | $0 |
| Total Federal Taxes | $0 | $0 | $0 | $0 | $0 |
| State and Local | | | | | |
| Income Tax Withholding | | | | | $0 |
| Unemployment (UT) | | | | | $0 |
| Disability Insurance (DI) | | | | | $0 |
| Empl Training Tax (ETT) | | | | | $0 |
| Sales | | | | | $0 |
| Excise | | | | | $0 |
| Real property | | | | | $0 |
| Personal property | | | | | $0 |
| Income | | | | | $0 |
| Other (Attach List) | | | | | $0 |
| Total State & Local Taxes | $0 | $0 | $0 | $0 | $0 |
| Total Taxes | $0 | $0 | $0 | $0 | $0 |

Schedule F
Pre-Petition Liabilities

| List Total Claims For Each Classification - | Claimed Amount | Allowed Amount (b) |
|---|---|---|
| Secured claims (a) | 20,252,133 | 20,252/33 |
| Priority claims other than taxes | 302 203 | 302,203 |
| Priority tax claims | 467,955 | 467,953 |
| General unsecured claims | 10,481,411 | 10,421,411 |

(a)   List total amount of claims even it under secured

(b)   Estimated amount of claim to be allowed after compromise or litigation  As an example, you are a defendant in a lawsuit
alleging damage of $10,000,000 and a proof of claim is filed in that amount  You believe that you can settle the case for a
claim of $3,000,000. For Schedule F reporting purposes you should list $10,000,000 as the Claimed Amount and
$3,000,000 as the Allowed Amount

Schedule G
Rental Income Information
Not applicable to General Business Cases

Schedule H
Recapitulation of Funds Held at End of Month

| | Account 1 | Account 2 | Account 3 | Account 4 |
|---|---|---|---|---|
| Bank | Wells Fargo | Wells Fargo | Wells Fargo | UnionBank |
| Account Type | Checking | Checking | Checking | Checking |
| Account No. | 5062559152 | 5062559160 | 5062559178 | B002 0231215 |
| Account Purpose | operating | payroll | lab | Corporate |
| Balance, End of Month | 38,463 | 846 | 2,695 | 8,772 |
| Total Funds on Hand for all Accounts | $0 | | | |

Attach copies of the month end bank statement(s), reconciliation(s), and the check register(s) to the Monthly Operating Report

Revised 1/1/93

38

STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
Increase/(Decrease) in Cash and Cash Equivalents
For the Month Ended _____

|  |  | Actual Current Month | | Cumulative (Case to Date) SAME AS CURRENT MONTH |
|---|---|---|---|---|
| | **Cash Receipts** | | | |
| 1 | Rent/Leases Collected | | | |
| 2 | Cash Received from Sales | 20,917 | | |
| 3 | Interest Received | 1,278 | | |
| 4 | Borrowings | 175,000 | | |
| 5 | Funds from Shareholders, Partners, or Other Insiders | | | |
| 6 | Capital Contributions | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | Total Cash Receipts | 197,195 | $0 | $0 |
| | **Cash Disbursements** | | | |
| 13 | Payments for Inventory | | | |
| 14 | Selling | | | |
| 15 | Administrative | 11,405 | | |
| 16 | Capital Expenditures | | | |
| 17 | Principal Payments on Debt | | | |
| 18 | Interest Paid | 1,663 | | |
| | Rent/Lease: | | | |
| 19 | Personal Property | 1,369 | | |
| 20 | Real Property | | | |
| | Amount Paid to Owner(s)/Officer(s) | | | |
| 21 | Salaries | 32,905 | | |
| 22 | Draws | | | |
| 23 | Commissions/Royalties | | | |
| 24 | Expense Reimbursements | | | |
| 25 | Other | | | |
| 26 | Salaries/Commissions (less employee withholding) | 65,408 | | |
| 27 | Management Fees | | | |
| | Taxes: | | | |
| 28 | Employee Withholding | 10,001 | | |
| 29 | Employer Payroll Taxes | 7,918 | | |
| 30 | Real Property Taxes | | | |
| 31 | Other Taxes | | | |
| 32 | Other Cash Outflows: | | | |
| 33 | Legal retainer | 50,000 | | |
| 34 | Operating expenses | 24,918 | | |
| 35 | Travel | 3,281 | | |
| 36 | Insurance | 10,245 | | |
| 37 | | | | |
| 38 | Total Cash Disbursements: | 223,752 | $0 | $0 |
| 39 | Net Increase (Decrease) in Cash | <26,558> | $0 | $0 |
| 40 | Cash Balance, Beginning of Period | 75,951 | | |
| 41 | Cash Balance, End of Period | 49,393 | $0 | $0 |

Revised 1/1/98

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on this 25th day of March, 2010, I caused to be filed and served

3   through the Bankruptcy Court's ECF system, a true and correct copy of the foregoing **MOTION**

4   **BY PLATINUM LONG TERM GROWTH LLC AND THE LAKEWOOD GROUP, LLC**

5   **TO CONVERT CASE TO CHAPTER 7, OR ALTERNATIVELY, FOR RELIEF FROM**

6   **THE AUTOMATIC STAY**, to:

7
        Stephen R. Harris
8       Belding, Harris, & Petroni, Ltd.
        417 W. Plumb Lane
9       Reno, NV 89509
        (775) 786-7600
10      steve@renolaw.biz
        Attorney for Debtor FirstGold Corp.

11  and

12
        Office of the United States Trustee
13      C. Clifton Young Federal Bldg
        300 Booth Street, Rm. 2129
14      Reno, Nevada 89509

15  and

16  • DAVID A. COLVIN    dcolvin@marquisaurbach.com,
      mwalters@marquisaurbach.com;kgallegos@marquisaurbach.com;tszostek@marquisaurba
17    ch.com

18  • REW R. GOODENOW    ecf@parsonsbehle.com

19  • NICOLE M. HARVEY    nicole@nicoleharvey.com

20  • ROBERT R. KINAS    rkinas@swlaw.com,
      jmath@swlaw.com;mfull@swlaw.com;cdossier@swlaw.com;lvdocket@mindspring.com;
21    vcampbell@swlaw.com;nbaig@swlaw.com;tmachnich@swlaw.com

22  • TIMOTHY A LUKAS    ecflukast@hollandhart.com

23  • LAURY MILES MACAULEY    lmacauley@lrlaw.com, rmaples@lrlaw.com

24  and

25

26

27

28

1   The Following Parties Served Via United States Mail

2   DAVID J COOK
    POB 270
3   SAN FRANCISCO, CA 94104

4   Creditors' Committee Member
    P & F DISTRIBUTORS
5   Sandra Papenhuase
    511 Tunnel Avenue
6   Brisbane, CA 94005

7   Creditors' Committee Member
    PLACER ELECTRIC, INC.
8   Richard Nogleberg
    5439 Stationers Way
9   Sacramento, CA 95842

10  Creditors' Committee Member
    SIERRA GEOSYNTHETIC SERVICE
11  Rodney Allen
    P.O. Box 1248
12  Kent, WA 98032

13

14

15                                         John Berwick
                                 Employee of Levene, Neale, Bender, Rankin &
16                                         Brill L.L.P.

17

18

19

20

21

22

23

24

25

26

27

28
                                    - 2 -